# THE EMPLOYERS' LIABILITY CASES.[1]

IN ERROR TO THE CIRCUIT COURTS OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TENNESSEE AND THE WESTERN DISTRICT OF KENTUCKY.

Nos. 216, 222. Argued April 10, 11, 12, 1907.—Decided January 6, 1908.

In testing the constitutionality of an act of Congress this court confines itself to the power of Congress to pass the act and may not consider any real or imaginary evils arising from its execution.

Under the grant given by the Constitution to regulate interstate commerce and the authority given to use all means appropriate to the exercise of the powers conferred, Congress has power to regulate the relation of master and servant to the extent that such regulations are confined solely to interstate commerce.

An act addressed to all common carriers engaged in interstate commerce, and imposing a liability upon them in favor of any of their employés, without qualification or restriction as to the nature of the business at the time of the injury, of necessity includes subjects wholly outside of the power of Congress under the commerce clause of the Constitution.

The legislative power of Congress over the District of Columbia and the Territories is plenary and does not depend upon the special grants of power, such as the commerce clause of the Constitution.

To restrict a general act of Congress relating to common carriers, by interpretation to interstate commerce so as to validate it as to the carriers in the several States, would unduly restrict it as to carriers in the District of Columbia and the Territories.

While it is the duty of this court to so construe an act of Congress as to render it constitutional if it can be lawfully done, an ambiguous statute cannot be rewritten to accomplish this result.

Where a statute contains some provisions that are constitutional and some that are not, effect may be given to the former by separating them from the latter, but this rule does not apply where the provisions of the statute are dependent upon each other and are indivisible, or where it does not plainly appear that Congress would have enacted the constitutional legislation without the unconstitutional provisions.

One engaging in interstate commerce does not thereby submit all his business to the regulating power of Congress.

[1] Docket titles, No. 216, Damselle Howard, Administratrix of Will Howard, deceased, v. Illinois Central Railroad Company and The Yazoo and Mississippi Valley Railroad Company; No. 222, N. C. Brooks, Administratrix of Morris S. Brooks, deceased, v. Southern Pacific Company.

While the act of Congress of June 11, 1906, 34 Stat. 232, known as the Employers' Liability Act, embraces subjects within the authority of Congress to regulate commerce, it also includes subjects not within its constitutional power, and the two are so interblended in the statute that they are incapable of separation and the statute is therefore repugnant to the Constitution of the United States and non-enforcible.[1]

THE facts, which involve the constitutionality of the act of Congress of July 11, 1906, relating to the liability of common carriers in the District of Columbia and Territories and common carriers engaged in interstate commerce to their employés, are stated in the opinion.

*Mr. William R. Harr* for plaintiff in error in No. 216.

*Mr. J. E. Torrance,* with whom *Mr. S. C. Bloss, Mr. Geo.*

---

[1] MR. JUSTICE WHITE delivered the opinion of the court. See p. 489.

MR. JUSTICE DAY concurred with MR. JUSTICE WHITE. See p. 504.

MR. JUSTICE PECKHAM delivered a separate opinion, with which the CHIEF JUSTICE and MR. JUSTICE BREWER agreed, concurring in result and in the proposition that as to traffic or other matters within the State the act is unconstitutional and it cannot be separated from that part which is claimed to be valid as relating to interstate commerce, but stating that he was not able to agree with all that is stated in the opinion of the court as to the power to legislate upon the subject of the relations between master and servant. See p. 504.

MR. JUSTICE MOODY delivered a separate opinion, agreeing with the opinion of the court in respect to the power of Congress to regulate the relation between common carriers engaged in interstate commerce and their employés, but dissenting from the result and conclusion that the act embraces subjects not within the constitutional power of Congress to regulate. See p. 504.

MR. JUSTICE HARLAN, with whom MR. JUSTICE McKENNA concurred, delivered a separate opinion, agreeing with that part of the opinion of the court which held that it was within the power of Congress to prescribe, as between an interstate carrier and its employés, the rule of liability established by the act, but dissenting as to the result and as to the interpretation given to the act in the opinion of the court and concurring in the views expressed by MR. JUSTICE MOODY as to the scope and interpretation of the act. See p. 540.

MR. JUSTICE HOLMES delivered a separate dissenting opinion expressing the view that the words of the act could be read in such a way as to save its constitutionality by limiting its scope where necessary and that as so construed the act is valid in its main features under the Constitution. See p. 541.

*Durelle* and *Mr. W. M. Smith* were on the brief, for plaintiff in error in No. 222:

The act of June 11, 1906, is a regulation of interstate commerce. The Constitution is one of enumeration and not of definition; the power of Congress over interstate commerce is as extensive as that of the legislative body of any sovereign state over its commerce. *Gibbons* v. *Ogden,* 9 Wheat. 187.

The power of Congress to regulate commerce extends to all the means, appliances, facilities and instrumentalities of commerce. *Welton* v. *Missouri,* 91 U. S. 275, 280; *Northern Securities Company* v. *United States,* 193 U. S. 197, 344; *Stockton* v. *Baltimore & N. Y. R. Co.,* 32 Fed. Rep. 9, 16. And this power extends to persons as well as property. *Linn Sing* v. *Washburn,* 20 California, 543; *"Head Money Cases,"* 18 Fed. Rep. 135; *Memphis & Little Rock Ry. Co.* v. *Nolan &c.,* 14 Fed. Rep. 532. This power also extends to those internal concerns which affect the States generally. See *Gibbons* v. *Ogden, supra,* 195.

A statute limiting a vessel owner's liability is valid. *The Lottawanna,* 21 Wall. 577; *Providence &c. S. S. Co.* v. *Hill Mfg. Co.,* 109 U. S. 589. See opinion of Harlan, J., sustaining an employers' liability act of the State of Ohio. *Peirce* v. *Van Dusen,* 78 Fed. Rep. 700.

State acts of this character have been held constitutional, as within the police powers of the State. *Missouri Pacific R. R. Co.* v. *Mackey,* 33 Kansas, 298; *S. C.,* 127 U. S. 205; *Chicago &c. R. R. Co.* v. *Zernecker,* 59 Nebraska, 689.

But the State may enact certain legislation for a purpose that is lawful, as police or quarantine legislation, while Congress may enact the same measures for the purpose of regulating commerce or as war regulation. *Gibbons* v. *Ogden, supra.* See *Chicago &c. Ry. Co.* v. *Solan,* 169 U. S. 133, 137, upholding a state statute denying to common carriers a right to limit their common law liability. Freund on Police Powers, 1904, p. 66, and also *Houston & T. C. R. R. Co.* v. *Mayes,* 201 U. S. 321.

Congress has the power to go beyond the general regulations

of commerce which it is accustomed to establish, and to descend to the most minute directions, if it shall be deemed advisable; and as to whatever ground shall be covered by those directions, the exercise of the state power is excluded. Congress may establish police regulations, as well as the States; confining their operations to the subject over which it is given control by the Constitution. Cooley's Const. Lim. (7th ed.), 856 and see *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, 215; *Champion* v. *Ames* (Lottery Cases), 188 U. S. 321. For the purpose of regulating commerce Congress can exercise the power of eminent domain. *Luxton* v. *Bridge Company,* 153 U. S. 525.

Congress by the act of June 11, 1906, has placed an additional burden on interstate common carriers and thus on interstate commerce and this brings the act clearly within the commerce clause of the Constitution. *Hall* v. *De Cuir,* 95 U. S. 485, 488. See message of President Roosevelt, December 5, 1906.

The Employers' Liability Act is a regulation of interstate commerce. It places the cost of certain classes of injuries to employés uniformly upon the interstate common carrier. If each State is allowed to say for itself whether or not the cost is to be borne by the interstate common carrier or by the family of the servant, it is apparent that common carriers passing through certain States with no liability acts will have an unnatural advantage over those not so situated. This uniformity is desirable. *Railroad Company* v. *Baugh,* 149 U. S. 368.

There should be no unnatural elements such as might be created by particular state laws or constructions by state courts placed upon the fellow-servant rule to vary the element of liability for injuries to employés in the general problem of the costs of interstate commerce.

The Federal liability act will secure better and safer service. The fellow-servant doctrine was based in part on a view that the best service was obtained by placing the cost of certain negligence on the servant. *Priestly* v. *Fowler,* 3 M. & W. 1; *Murray* v. *South Carolina R. R. Co.,* 1 McMull L. (S. Car.)

385; *S. C.*, 36 Am. Dec. 286; *Farwell* v. *Boston &c. R. R. Co.*, 38 Am. Dec. 339; *Sullivan* v. *Mississippi &c. R. Co.*, 11 Iowa, 421; *Union Pacific R. R. Co.* v. *Erickson*, 41 Nebraska, 1.

Congress now takes the view that better service will be secured by the rule of liability established by the act of June 11, which is similar in its scope to the Safety Appliance Act. 27 Stat. L. 531; *Chicago &c. R. R. Co.* v. *Ross*, 112 U. S. 377. That is constitutional. *Kansas City &c. R. R. Co.* v. *Flipps*, 138 Alabama, 487. It has been construed in *Johnson* v. *Southern Pac. Co.*, 117 Fed. Rep. 462; affirmed 196 U. S. 1, and in *Chicago &c. R. R. Co.* v. *Voelker*, 129 Fed. Rep. 526; *S. C.*, 116 Fed. Rep. 867.

The form of the rule or statute regulating interstate commerce is within the discretion of Congress. To effect this end of uniformity Congress may use such means as it may deem appropriate. *McCulloch* v. *Maryland*, 4 Wheat. 316, 421, 423.

An act of Congress to be within its power to regulate commerce need not upon its face, expressly prescribe a rule for carrying on commercial intercourse among the States. The rule may be prescribed by implication. A law which may reasonably be calculated to further the freedom, uniformity and safety of commerce, or its instrumentalities, prescribes a rule for carrying on commerce within the scope of the power to regulate commerce among the States.

The act shows by its title and in its body that it applies to interstate commerce, and it is not framed so that its provisions are applicable alike to all commerce.

The court will not broaden the statute by construction to include an employé of an interstate common carrier, who is concerned wholly in that part of the carrier's business which is intrastate, for the purpose of then holding the entire act unconstitutional. It will rather hold in a proper case that such an employé is not within the view of the act. *Kansas* v. *Smiley*, 65 Kansas, 240; *S. C.*, 196 U. S. 447.

State statutes relating to commerce which are in terms so general that interstate as well as intrastate commerce may be included are construed to include only what the legislature

might lawfully include in them.  17 Am. & Eng. Ency. of Law
(2d ed.), 76; *Louisville &c. Ry. Co.* v. *Mississippi*, 133 U. S.
587.

An act will be so construed  f possible, as to avoid conflict
with the Constitution although such a construction may not
be the most obvious or natural one.  The courts may resort
to an implication to sustain a statute, but not to destroy it.
*Atlantic City Water Works Co.* v. *Consumers' Water Co.*, 44
N. J. Eq. 427; 1 Sutherland, Stat. Const. (2d ed.), § 298, p. 584;
*Opinion of the Justices*, 41 N. H. 555.

A statute will not be held unconstitutional merely because
there may be persons to whom or cases in which, it cannot
constitutionally apply; but it is deemed constitutional and
to be construed not to apply to the latter persons or cases,
on the grounds that courts are bound to presume that the
legislature did not intend to violate the Constitution.  And see
*The Trade-Mark Cases*, 100 U. S. 82.  The attempt to justify
the act under the commerce clause was an afterthought;
but in this case the phraseology of the act plainly indicates
under what clause of the Constitution Congress assumed to act.
*Illinois Central R. Co.* v. *McKendree* can also be distinguished.

The construction of the Liability Act now contended for
here has been given the Safety Appliance Act in *Johnson* v.
*Southern Pac. Co.*, 196 U. S. 1.  The wording of this act is
open to all the objections that counsel urge against the act
under consideration.  If the car or engine in a particular case
is not engaged as an instrumentality of interstate commerce,
then the Safety Appliance Act will not be enforced .

But in the cases at bar, all the employés and trains con-
cerned were engaged in interstate commerce, and the right
of the plaintiff to recover is clearly within the terms of the act.

The "fellow-servant" rule as followed by the Federal courts
is a rule of judicial decision and construction.  The act of
June 11, 1906, changes this rule of determining liability.  The
power to determine such rules as the Federal courts shall
follow has always been exercised by Congress.

*The Attorney General* as *amicus curiæ* by leave of the court upon the constitutionality of the Employers' Liability Act, with whom *Mr. William R. Harr*, Special Assistant to the Attorney General, was on the brief:

The act was a natural and logical step from the Safety Appliance Act, which required interstate railroads to equip their cars with certain described appliances and abolished the doctrine of assumption of risk on the part of employés in the case of their failure to do so.    The acts of March 3, 1901, 31 Stat. 1446; of June 30, 1906, 34 Stat. 838; of March 4, 1907. 34 Stat. 1415, all relating to the relation of employers and employés engaged in interstate commerce are all part of a general scheme by Congress to lessen the dangers of railroad transportation to those engaged in or connected therewith.    If this statute is unconstitutional, it is difficult to see how, on principle, the other measures referred to can be sustained.    See also the President's annual messages of December 6, 1904, 39 Cong. Rec. 11; of December 5, 1905, 40 Cong. Rec. 93; *Johnson* v. *Southern Pacific Co.*, 196 U. S. 1.

As to the question of public policy involved in maintaining the fellow-servant rule see McKinney on Fellow Servants, § 10; *Priestley* v. *Fowler*, 1837, 3 M. & W. 1; *Hutchinson* v. *York &c. Ry. Co.*, 1850, 5 Exch. 341; *McMurray* v. *So. Car. R. R. Co.*, 1838, 1 McMullan, *385; *Ryan* v. *Cumberland Valley R. R. Co.*, 1854, 23 Pa. St. 384; *Farwell* v. *Boston &c. R. R. Co.*, 1842, 4 Metc. 49, 57.    But see also *Schlemmer* v. *Buffalo R. & P. Ry. Co.*, 205 U. S. 1; 2 Labbatt on Master & Servant, chaps. 36–40, and the acts of Parliament of 1881, 1897 and 1902; Cooley on Torts, 542, 545.

The Parliament of England and many of the state legislatures of this country, however, have not acquiesced in the views as to the requirements of public policy entertained by the courts that have created and extended the fellow-servant doctrine, so far, at least, as the more hazardous employments, and particularly railroading, are concerned.    It also appears that other European countries, including France, Germany

and Austria, are in accord with the more enlightened views on this subject.

Many States have legislated on the subject, modifying the common law rule. See the acts of Georgia of 1855; of Iowa in 1862; of Kansas in 1874.

The English Employers' Liability Act of 1880–1881 has been followed, more or less closely, by Alabama in 1884; Massachusetts in 1887; Colorado in 1893; Indiana in 1893; New York in 1902. The statutes of these States do not limit the amount of recovery.

The following States have also materially modified or abolished the fellow-servant doctrine: Ohio in 1890; Mississippi in 1890; Texas in 1891; Arkansas in 1893; South Carolina in 1895; North Carolina in 1897; Utah in 1875; Wisconsin in 1889.

And see sustaining this legislation: *Chicago &c. R. R. Co.* v. *Ross,* 112 U. S. 377, 382; Shearman & Redfield on Negligence (5th ed.), § 178. See also *Lovell* v. *Howell,* L. R. 1 C. P. D. 161, 167; *Ziegler* v. *Danbury &c. R. R. Co.,* 52 Connecticut, 543, 556; *Crispin* v. *Babbitt,* 81 N. Y. 516, 528.

As the enforcement or abrogation of the rule is a matter of public policy, and necessarily a matter for the consideration and control of the legislature under our governmental systems, to whom matters of public policy are primarily committed, Congress is the proper authority to determine what public policy requires with reference to common carriers engaged in interstate commerce.

State legislation modifying or abolishing the common law doctrine of common employment and assumption of risk has been uniformly sustained by the state and Federal courts, as a proper exercise of the police power. *Mo. Pac. Ry. Co.* v. *Mackey,* 127 U. S. 205, 208; *Minneapolis Ry. Co.* v. *Herrick,* 127 U. S. 210; *Chicago &c. R. R.* v. *Pontius,* 157 U. S. 209; *Baltimore & Ohio Railway* v. *Voight,* 176 U. S. 498; *McGuire* v. *C., B. & Q. Ry.,* 108 N. W. Rep. (Iowa) 902, 908; *Hancock* v. *Railway Co.,* 124 N. Car. 222, upholding fellow-servant law of

that State; *Pittsburgh &c. Railway* v. *Montgomery*, 152 Indiana, 1, sustaining act of that State. And see also *Baltimore &c. Railroad* v. *Little*, 149 Indiana, 167; *Baltimore &c. Railroad* v. *Peterson*, 156 Indiana, 1; *Indianapolis &c. Railroad* v. *Houlehan*, 157 Indiana, 494; and *Tullis* v. *Lake Erie & Western*, 175 U. S. 348. The Georgia fellow-servant act has been held to be constitutional. *Railroad Co.* v. *Thompson*, 54 Georgia, 509; *Georgia Railroad* v. *Ivey*, 73 Georgia, 499; *Georgia Railroad* v. *Brown*, 86 Georgia, 320; *Georgia Railroad* v. *Miller*, 90 Georgia, 574. As to labor statute of Missouri, see *St. Louis &c. Railway* v. *Matthews*, 165 U. S. 1, 25; of Utah, *Holden* v. *Hardy*, 169 U. S. 366, 391, 397; of Arkansas, *St. Louis & Iron Mountain R. R. Co.* v. *Paul*, 173 U. S. 404. See also *Atchison &c. Railroad* v. *Matthews*, 174 U. S. 96.

The liability of common carriers for injuries to their employés is a proper subject of governmental regulation, and a State in the exercise of its police powers may make such reasonable regulations on the subject with respect to all carriers operating within its limits as the legislature thereof may deem necessary. Being a proper subject of governmental regulation, Congress, in the exercise of its constitutional power to regulate interstate and foreign commerce, may regulate the liability of such common carriers as are engaged in that commerce.

See the definition of the power of Congress over interstate and foreign commerce given in *Gibbons* v. *Ogden*, 9 Wheat. 1 (p. 197). From the foundation of the Government the power of Congress to regulate interstate and foreign commerce has been construed to extend to the regulation of the instrumentalities by which such commerce is conducted, and the regulation of such instrumentalities to include control over the person operating the same. Concurring opinion in *Gibbons* v. *Ogden*, of Johnson, J., 9 Wheat. 229; *Sherlock* v. *Alling*, 93 U. S. 99, 103; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 203; Pomeroy on Const. Law, §§ 379 *et seq.*; *Patterson* v. *Bark Eudora*, 190 U. S. 169, 179, upholding the power

of Congress to legislate for protection of seamen by act of December 21, 1898, 30 Stat. 755, 763. See also *Pensacola Telegraph Co.* v. *West. Un. Tel. Co.*, 96 U. S. 1, 9; *Bowman* v. *Chicago &c. Railway*, 125 U. S. 465; *Crutcher* v. *Kentucky*, 141 U. S. 47, 58; *Pittsburg Coal Co.* v. *Bates*, 156 U. S. 577, 587; *Stockton* v. *Baltimore &c. Railroad*, 32 Fed. Rep. 9. In *California* v. *Pacific Railroad*, 127 U. S. 1, 39, the power of Congress to provide for interstate roads was sustained; as to the Panama Canal see *Wilson* v. *Shaw*, 204 U. S. 24; for a review of legislation in regard to interstate commerce and regulations see *In re Debs*, 158 U. S. 564, 578; *The Lottery Case*, 188 U. S. 321, 352; *United States* v. *Joint Traffic Assn.*, 171 U. S. 505, 569.

As to the claim that if this commerce is subject to regulation at all it can only be by the States, the answer is that the regulation of interstate commerce has been committed by the Constitution to Congress; and while state legislation, passed in the exercise of its police power, may control the liability of common carriers within their limits, even though they be engaged in interstate commerce, yet such legislation must yield to the plenary and paramount authority of Congress over interstate commerce whenever it chooses to exercise it. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210; *Cooley* v. *Board of Wardens*, 12 How. 299, 320; *Morgan* v. *Louisiana*, 118 U. S. 455, 463; *Smith* v. *Alabama*, 124 U. S. 465; *Nashville, Chattanooga & St. Louis Ry.* v. *Alabama*, 128 U. S. 96, 100; *Western Union Telegraph Co.* v. *James*, 162 U. S. 650, 662; *Hennington* v. *Georgia*, 163 U. S. 299, 317; *New York, New Haven & Hartford Railroad* v. *New York*, 165 U. S. 628, 631; *Missouri, Kansas & Texas Railway* v. *Haber*, 169 U. S. 613, 626; *Rasmussen* v. *Idaho*, 181 U. S. 198, 200; *Reid* v. *Colorado*, 187 U. S. 137.

The power of Congress to regulate the liability of common carriers and others engaged in interstate commerce for injuries to persons or property having been distinctly recognized, it is difficult to see why it may not regulate their liability to their

employés, the protection of interstate commerce being as much involved in the one case as in the other. *Mo. Pac. Railway* v. *Mackey, supra; Pierce* v. *Van Dusen,* 78 Fed. Rep. 693, 698.

The liability of common carriers engaged in interstate commerce for injuries to their employés occasioned by their negligence is a matter that vitally enters into and affects such commerce. *Baltimore and Ohio Railroad* v. *Baugh,* 149 U. S. 368.

No one can successfully question the correctness of the court's statement that the liability of a common carrier engaged in interstate commerce for injuries to its employés is a question in which the whole country is interested, and should be governed by a uniform rule. But simply holding that the question is one of general law, which a Federal court may determine for itself in the absence of a state statute on the subject, does not tend to secure the desired uniformity, but only causes greater complexity of decision. Besides, most of the States have legislated on the subject and their statutes are conflicting. Uniformity of decision, it is manifest, can only be secured by National legislation.

As to power of Congress to provide this uniformity see *Pennsylvania Railroad* v. *Hughes,* 191 U. S. 477; *Martin* v. *Pittsburg &c. Railroad,* 203 U. S. 284 and cases cited *supra.*

The acts of Congress limiting liability of shipowners, §§ 4283, 4289, Rev. Stat., rest on the power of Congress to regulate interstate and foreign commerce. *Lord* v. *Steamship Co.,* 102 U. S. 541; *The Katie,* 40 Fed. Rep. 480; *In re Garnett,* 141 U. S. 1; *The Lottawanna,* 21 Wall. 558, 576; *Butler* v. *Steamship Co.,* 130 U. S. 527. The Limited Liability Act was passed by Congress for the purpose of fostering and encouraging the American merchant marine and the American foreign carrying trade. Such also was undoubtedly the purpose of the Harter Act, approved February 13, 1893, 27 Stat. 445, which has been liberally construed and applied by this court in a number of cases. *Calderon* v. *Atlas Steamship Co.,* 170 U. S

272; *The Carib Prince,* 170 U. S. 655; *The Silvia,* 171 U. S. 462; *Knott* v. *Botany Mills,* 179 U. S. 69; *International Nav. Co.* v. *Farr &c. Mfg. Co.,* 181 U. S. 218.

It is for Congress to determine what public policy requires with respect to common carriers engaged in interstate commerce by land or water. Possibly the rule established by Congress is unwise, possibly it is extreme, but neither of these considerations justifies the interference of the judiciary or is an argument against the existence of the power. *United States* v. *Joint Traffic Association,* 171 U. S. 569, 571, 573; *Gibbons* v. *Ogden,* 9 Wheat. 1; *The Lottery Case,* 188 U. S. 363; *McCray* v. *United States,* 195 U. S. 27, 55.

The power of Congress to regulate instrumentalities of interstate commerce is not dependent upon their mode of creation. It is not limited to corporations created by Congress itself.

While a corporation may get from a State its franchise to engage in interstate commerce, it can only exercise that franchise subject to the regulations which Congress may make for the protection of interstate commerce. *Hale* v. *Henkel,* 201 U. S. 43, 75; *Northern Securities Case,* 193 U. S. 197; *New York & New Haven Railroad* v. *Interstate Commerce Commission,* 200 U. S. 361.

The situation is similar to that with respect to the power of Congress to regulate bridges across the navigable waters constructed under the authority of the States. The franchise granted by the State is held subject to the paramount authority of Congress to regulate interstate commerce. *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1; *West Chicago Street Railroad Co.* v. *Chicago,* 201 U. S. 506, 524; *Union Bridge Co.* v. *United States,* 204 U. S. 364.

Congress by this act has established a rule of conduct and the statute imposes exactly the same rule of conduct upon carriers with respect to employés as is to be imposed by the common law with respect to passengers and strangers.

Congress has the same power to alter the common law rule as to non-survivorship in cases affecting interstate commerce of

actions *ex delicto* as a State has to change the rule of non-survivorship of such actions.

In this respect the act of Congress creates no innovation, as such statutes exist in most, if not all, of the States. And see *Sherlock* v. *Alling,* 93 U. S. 99, as to power of State.

So also Congress has power to alter rule as to effect of contributory negligence. While there is no question of contributory negligence in this case it is proper to refer to it in connection with the act.

The common law rule that contributory negligence bars a recovery, like the fellow-servant doctrine, is founded upon the supposed interests of public policy, and it is for Congress to determine in regulating this subject whether public policy requires the modification of both rules.

The rule which Congress has adopted in the present statute is, theoretically at least, ideal. If it should operate harshly or unjustly, the parties concerned must apply to Congress and not to the courts for relief.

The statute simply provides that contributory negligence on the part of an employé shall not bar a recovery where it was slight and that of the employer gross in comparison; but it also provides that the damages shall be diminished in proportion to the amount of negligence attributable to the employé.

The aim of Congress was to do exact justice. The wisdom of such a rule as applied to marine torts was recognized in *The Max Morris,* 137 U. S. 1.

The same doctrine was applied to *The Mystic,* 44 Fed. Rep. 399; *The Frank & Willie,* 45 Fed. Rep. 405, 497; *The Nathan Hale,* 48 Fed. Rep. 700; *The Julia Fowler,* 49 Fed. Rep. 279; *The Serapis,* 49 Fed. Rep. 396, 397; *The J. & J. McCarthy,* 55 Fed. Rep. 86; *The Cyprus,* 55 Fed. Rep. 333; *Wm. Johnson & Co.* v. *Johnson,* 86 Fed. Rep. 888. All except the first were cases in which an injured employé, himself at fault, was allowed to recover divided or partial damages for injuries received through the negligence of his employer.

For modifications of the strict rule of contributory negligence

see 2 Labbatt on Master and Servant, 782, citing statutes of Tennessee, Georgia and Ohio. See also H. R. Rep.. No. 2335, 59th Cong., 1st Sess.

As to the construction of the act, it is limited to subjects within the control of Congress and does not affect any matters not within such control.

Whether a particular carrier is engaged in interstate or foreign commerce within the meaning of the act is a question to be determined as the occasion arises.

As the States, in the exercise of their police powers, may enact legislation of the kind here in question, although it may incidentally affect interstate commerce, by a parity of reasoning, Congress, in the exercise of its authority to regulate interstate commerce, may enact such legislation, although it incidentally affects state commerce.

There is an essential difference between the power of Congress over an article or commodity which ceases to be a subject of interstate commerce the moment its interstate transportation ceases, and the instrumentality by which such commodity may be transported. *Johnson* v. *Southern Pacific*, 196 U. S. 1; *Voelker* v. *Chicago &c. Railway*, 116 Fed. Rep. 867; *S. C.*, 129 Fed. Rep. 522, 528; *United States* v. *Great Northern Railway*, 145 Fed. Rep. 438.

It is not contended that Congress can regulate the exclusively local business in which a common carrier may be engaged. If a railroad company operating an interstate road were also operating a purely local line, this act would not apply to such line, because, in respect thereto, the railroad company would not be a common carrier engaged in interstate commerce. The act would no more apply to a purely local line of the company than to any other business—the mining of coal, for instance—in which it might be engaged. *The Trade-Mark Cases*, 100 U. S. 82, can be distinguished as the present statute discloses on its face that it is intended as a regulation of interstate and foreign commerce, being expressly confined to common carriers engaged in such commerce. The "main purpose"

of the act is not "to establish a regulation applicable to all trade, to commerce at all points," but simply to regulate an instrumentality of interstate commerce. It is not "designed to govern commerce wholly between citizens of the same State," but simply to protect interstate commerce. Local commerce, if affected at all, is affected only indirectly and incidentally. It has never been held that Congress was divested of control over the instrumentalities of interstate commerce simply because local commerce might incidentally be affected by its regulations. *Interstate Commerce Commission* v. *Baird*, 194 U. S. 25; The "*Beef Trust Case*," *Swift* v. *United States*, 196 U. S. 375; *New York & New Haven* v. *Int. Com. Comm.*, 200 U. S. 361.

On its face this statute relates only to interstate commerce. It seeks only to regulate the liability of a common carrier engaged in such commerce to its employés—that is, the persons employed by it for the purpose of carrying on its business, and the only business referred to is trade and commerce between the several States. It is a remedial statute and should, therefore, be liberally construed so as to accomplish the end in view. If to construe the statute to extend to employés of such carrier not engaged in or connected with the interstate business of the carrier would render the statute unconstitutional, such construction manifestly ought to be rejected. The elementary rule that a statute should not be construed so as to render it unconstitutional when a constitutional construction is open to the court hardly needs to be argued. *United States* v. *Reese*, 92 U. S. 214; *United States* v. *Harris*, 106 U. S. 629; *Baldwin* v. *Franks*, 120 U. S. 678; *James* v. *Bowman*, 190 U. S. 127; *The Trade-Mark Cases*, distinguished. The statutes there involved were, on their face, plain attempts to regulate matters beyond the control of Congress, and so also in *Illinois Central Railroad* v. *McKendree*, 203 U. S. 514.

This case falls under *McCullough* v. *Virginia*, 172 U. S. 102, 112; *Packet Co.* v. *Keokuk*, 95 U. S. 80; *Tiernan* v. *Rinker*, 102 U. S. 123; *In re Rahrer*, 140 U. S. 545, 563.

Nor does the fact that the act extends to all employés of common carriers engaged in interstate and foreign commerce, irrespective of the danger of their particular employments, vitiate it. The business of common carriers forms a proper basis of classification and special legislation. It is not necessary for the legislature to go further and differentiate between the different classes of employés of such carriers according to the degree of danger to which they may be subjected, although possibly it may do so. As is well known, there is every variety of risk in the conduct of such carriers and the power of the legislature to distinguish, select and classify objects of legislation necessarily has a wide range of discretion, and it is sufficient to satisfy the demands of the Constitution if the classification is practical and not palpably arbitrary. *Tullis* v. *Lake Erie & Western Railroad,* 175 U. S. 352, 353, referring to *Orient Insurance Co.* v. *Daggs,* 172 U. S. 557. The law is equitable, but were it otherwise, the injustice or harshness of the rule would be no just cause for declaring it invalid. In that case, as has been often held, the remedy lies not with the courts, but with the legislature. If necessary, under *Church of the Holy Trinity* v. *United States,* 143 U. S. 457, the general language of the statute might be restricted to those employés of common carriers engaged in interstate commerce whose business is of a hazardous nature, as it was the dangers of transportation which were intended to be remedied. And see *Jones* v. *Guaranty and Indemnity Co.,* 101 U. S. 626.

These matters relate to the application of the statute to particular cases, and do not affect its constitutionality.

The act in question has recently been held to be constitutional by several Federal courts. *Plummer* v. *Northern Pacific Railway Co.,* Circuit Court, Western District of Washington, Hanford, J., decided March 2, 1907; *Spain* v. *St. Louis & San Francisco Railroad Co.,* District Court, Eastern District of Arkansas, Trieber, J., decided March 13, 1907; *Kelley* v. *Great Northern Railway Co.,* Circuit Court, District of Minnesota,

Morris, J., decided March, 1907; *Snead* v. *Central Georgia Railway Co.*, Circuit Court, Southern District of Georgia, Eastern Division, Speer, J., decided March 25, 1907.

*Mr. J. M. Dickinson*, with whom *Mr. Charles N. Burch* and *Mr. Blewett Lee* were on the brief, for defendants in error in No. 216:

The Employers' Liability Act is not a regulation of commerce and is, therefore, unconstitutional and void. The Government of the United States is one of enumerated powers, and unless authority can be found in the National Constitution for the enactment of any particular legislation, then such authority does not exist. The Constitution of the United States specifies what powers Congress has and it has those powers therein specified and none other, except such as are necessarily implied to carry into effect those which are granted. *Gibbons* v. *Ogden*, 9 Wheat. 1, 195; *Veazie & Young* v. *Moor*, 14 How. 568; *Railroad Co.* v. *Richmond*, 19 Wall. 584; Tucker on Const. of U. S., § 250; Cooley's Const. Lim. (7th ed.), 11; *Welton* v. *Missouri*, 91 U. S. 275; *The Lottery Cases*, 188 U. S. 321; *Williams* v. *Fears*, 179 U. S. 270, 278.

This power of Congress must be exercised in a constitutional way. It is not destructive of the rights and guaranties which are to be found in other sections of the Constitution and the amendments thereto. The power to regulate commerce cannot be so exercised as to deprive a citizen of property without due process of law, but must be exercised in subordination to the limitations and guaranties of the Constitution. *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312.

The Employers' Liability Act prescribes no rule for the regulation of commerce, whether commerce be understood to be either traffic or intercourse. It defines the liability of an interstate carrier to his employés, creates new rights of action in favor of such employés, and takes away from the common carrier defenses heretofore available. Such legislation is not a regulation of commerce, and Congress has no more

power to define the liability of common carriers, engaged in interstate commerce, to their employés, than it has power to legislate on the _domestic relations of merchants engaged in interstate commerce. The argument that this act is a constitutional regulation of interstate commerce proceeds upon the fundamentally erroneous theory that Congress has power to regulate persons engaged in interstate commerce in all the relations of life,—whereas, the power conferred by the Constitution is only the regulation of the commerce itself.

No argument to sustain the constitutionality of the act in question can draw any support from the Safety Appliance Acts of March 2, 1893, April 1, 1896 and March 2, 1903.

Those acts definitely apply to instrumentalities of interstate commerce.

While undoubtedly Congress has power to enact laws to carry into effect and to execute other laws, which it may constitutionally enact; but the laws to be carried into effect must be constitutionally enacted; the laws which carry into execution the constitutional powers of the Government, must be necessary and proper; that is they must be appropriate. *Hepburn* v. *Griswold*, 8 Wall. 603; *Martin* v. *Hunter*, 1 Wheat. 304; *M'Culloch* v. *Maryland*, 4 Wheat. 316, 423.

It is a general rule, that what cannot be done directly from defect of power, cannot be done indirectly. *Wayman* v. *Southard*, 10 Wheat. 50.

The court will determine for itself whether or not merely giving a right of action against common carriers of interstate commerce to their employés is of itself a regulation of commerce. *Mugler* v. *Kansas*, 123 U. S. 623; *Minnesota* v. *Barber*, 136 U. S. 313; *Hennington* v. *Georgia*, 163 U. S. 299.

State statutes giving rights of action for torts against interstate carriers have been held not to be regulations of interstate commerce. *Sherlock* v. *Alling*, 93 U. S. 99, 103. A Federal statute, therefore, giving similar rights of action is not a regulation of interstate commerce.

*Smith* v. *Alabama*, 124 U. S. 465, does not hold that giving

a right of action for injury is a regulation of commerce, and references in *Peirce* v. *Van Dusen*, 78 Fed. Rep. 693, and other cases cited by plaintiff in error, as to the power of Congress to legislate in regard to that subject, are *obiter*.

The act embraces both interstate and intrastate commerce, proposes to exercise an unconstitutional power over intrastate commerce, the police power of the States, the power of the States to regulate the rights of their citizens *inter sese* in matters not directly affecting interstate commerce, is inseparable as to its interstate commerce features, and, therefore, must fail *in toto*.

As to what interstate commerce is, see Sutherland on U. S. Constr. 95; *Welton* v. *Missouri*, 91 U. S. 275; *Addyston Pipe Case*, 175 U. S. 211, 241; *License Cases*, 5 How. 504, 574, 620, 625; *Passenger Cases*, 7 How. 283, 400; *License Tax Cases*, 5 Wall. 462, 470; *The Daniel Ball*, 10 Wall. 557, 564. As to the coexistence of both interstate and intrastate commerce see *Freight Tax Case*, 15 Wall. 232, 277; *Hall* v. *DeCuir*, 95 U. S. 485; *Lord* v. *Steamship Co.*, 102 U. S. 541; *Wabash Railway* v. *Illinois*, 118 U. S. 557; *Sands* v. *Manistee River Imp't Co.*, 123 U. S. 288; *Covington Bridge Case*, 154 U. S. 204; *Greer* v. *Connecticut*, 161 U. S. 519; *Kidd* v. *Pearson*, 128 U. S. 1; *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 12, in which this court said commerce succeeds to manufacture and is not a part of it. And see *Hopkins* v. *United States*, 171 U. S. 578; *Diamond Glue Co.* v. *U. S. Glue Co.*, 187 U. S. 611; *Northern Securities Case*, 193 U. S. 197, 350.

The act interferes with the police power of the State and while there is an intrastate commerce which Congress cannot regulate, there is also equally removed from the control of the United States the police power of the States which affects commerce and other relations in life, some related to commerce, and others entirely disassociated from it.

Although the limitations of the police power have never been fully defined, the police power of the States falls directly within the effect of this act and will, if the act is con-

stitutional, have limitations imposed upon it entirely incon-
sistent with the exercise of that power as hitherto recognized.
The act seeks to control the relations between carriers of in-
terstate commerce and their employés, not merely in matters
that affect, but do not burden, interstate commerce, but also
in matters which can have no direct bearing upon interstate
commerce.

This court has ever been equally careful to preserve the
rights and powers of the States as well as those of the National
Government. *Osborne* v. *Florida*, 164 U. S. 650; *Pullman Co.*
v. *Adams*, 189 U. S. 420; *Pennsylvania Railroad* v. *Knight*,
192 U. S. 21; *Louisville &c. Railway Co.* v. *Mississippi*, 133
U. S. 587, 591; *C. & O. Railway* v. *Kentucky*, 179 U. S. 388, 393.

So the police power of the State has been sustained where
it operated upon articles of commerce after their interstate
character had ceased. The States of the Union have the un-
doubted right to control their purely internal affairs, in doing
which they exercise powers not surrendered to the National
Government. *Leisy* v. *Hardin*, 135 U. S. 100, 123; *Mobile* v.
*Kimball*, 102 U. S. 691; *Escanaba Co.* v. *Chicago*, 107 U. S.
678; *Mugler* v. *Kansas*, 123 U. S. 623; *Eilenbecker* v. *District
Court of Plymouth County*, 134 U. S. 31, 40; *Chicago, Mil-
waukee & St. Paul Ry. Co.* v. *Solan*, 169 U. S. 133.

The statement in *Smith* v. *Alabama*, 124 U. S. 465, that
Congress could legislate on the subject of engineers' examina-
tions was said only in respect of interstate commerce, and can
be no authority for the contention that because it was asserted
that Congress could in the particular matter legislate in respect
of interstate commerce, it could also regulate the carrier in
its strictly intrastate commerce activities, and in those matters
having no direct relation to commerce. So also *Western Union
Telegraph Company* v. *James*, 162 U. S. 650; *Nashville &c.
Railway* v. *Alabama*, 128 U. S. 59; *Pennsylvania Railroad* v.
*Hughes*, 191 U. S. 477, 489. In *Louisville & Nashville R. R.
Co.* v. *Kentucky*, 161 U. S. 677, it was held that a state statute
prohibiting consolidation of two railroads was not an inter-

ference with interstate commerce. As to reasonable exercise of state police power, see *Gladson* v. *Minnesota*, 166 U. S. 427; *Cleveland &c. Railway Co.* v. *Illinois*, 177 U. S. 514, 519; *Lake Shore Railway* v. *Ohio*, 173 U. S. 285, 303; *Lake Shore Railway* v. *Smith*, 173 U. S. 684, 689; *Northern Securities Case*, 193 U. S. 197, 382; *B. & O. Railroad* v. *Baugh*, 149 U. S. 368, distinguished.

The act is bad in that it proposes not merely to give a right of action for injuries to employés, but determines who the beneficiaries shall be. The beneficiaries are different from those under the law of the State where the death occurred. Congress has no power to regulate the measure of damages or who the beneficiaries shall be. This is within the reserved power of the States.

The cases cited in the brief of the United States as to the rule of damages in the case of injuries on vessels fall under the admiralty and maritime jurisdiction and not under the commerce clause. They have no application to the rules established by this statute. The statute, if constitutional as to any part, is unconstitutional as to other parts and as it is inseparable it is entirely unconstitutional. *United States* v. *Reese*, 92 U. S. 214, 221; *Trade-Mark Cases*, 100 U. S. 82, 98; *United States* v. *Ju Toy*, 198 U. S. 253; *Illinois Central* v. *McKendree*, 203 U. S. 514; *Baldwin* v. *Franks*, 120 U. S. 678, 686; *Ballard* v. *Cotton Oil Co.*, 81 Mississippi, 507. The rule is the same whether the case be civil or criminal. *Conolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 565. And on this point see also *Allen* v. *Louisiana*, 103 U. S. 80; *Sprague* v. *Thompson*, 118 U. S. 90, 94; *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601, 635, from which it appears that an act of Congress covering legitimate as well as illegitimate fields of legislation in a single provision cannot be rendered effective by holding it invalid as to the field wherein Congress had no power to legislate. To reject the legislation so far as it is invalid and enforce the remainder would amount to substituting legislation by the court for that by Congress.

The act is unconstitutional in that it violates the Fifth Amendment to the Constitution of the United States.

Arbitrary and capricious classification, by which a class of persons is subjected to unusual burdens, is obnoxious either to the Fifth or to the Fourteenth Amendment. If a state statute, it is obnoxious to the Fourteenth Amendment; if a Federal statute, it is obnoxious to the Fifth Amendment. Both Amendments protect corporations, as well as natural persons, from being deprived of property without due process of law, and, therefore, protect against arbitrary classification. *County of San Mateo v. Southern Pacific Railroad,* 13 Fed. Rep. 145, 150.

The act violates the Fifth Amendment because: It subjects common carriers, engaged in interstate commerce, to different and greater liabilities than others engaged in interstate commerce; it takes away from common carriers defenses available to others engaged in interstate commerce; it limits the powers of contract of common carriers, when others engaged in interstate commerce are not so limited in their contracts with their employés; it subjects employés of such common carriers to a disability in contracting which does not attach to employés of others engaged in interstate commerce, who render a like service under similar conditions.

The right to contract is as well recognized as the right to property and the courts protect it against unlawful restriction. *Allgeyer v. Louisiana,* 165 U. S. 578; *State v. Julow,* 129 Missouri, 163; *Gillespie v. People,* 188 Illinois, 176; *State v. Kreutsberg,* 114 Wisconsin, 530; *People v. Marcus,* 185 N. Y. 257, holding state statutes limiting right to contract in regard to labor invalid. See also *Wallace v. Georgia &c. Railway Co.,* 22 S. E. Rep. 579; *Brewster v. Miller's Sons Co.,* 101 Kentucky, 368; *Hundley v. L. & N. R. Co.,* 105 Kentucky, 162; *State v. Bateman,* 7 Ohio N. P. R. 478; *Railroad Company v. Richmond,* 19 Wall. 584.

The burdens cast upon carriers by the act are cast upon all common carriers engaged in interstate commerce without distinction or discrimination. There are many classes of

common carriers, as by rail, by water, by telephone, by telegraph, by pipe line, by wagon and otherwise.

There are not the same reasons for the abolition of the fellow-servant rule as to clerks in the auditor's office as there are for its abolition as applied to train operatives.

By due process of law is meant, that if a particular class is to be given particular benefits or subjected to particular burdens or disabilities, there should be some good reason for such classification. *Stratton* v. *Morris*, 89 Tennessee, 497, 534.

There is no natural basis for the classification which has been made, but the basis is purely arbitrary and capricious. In order for a classification to be constitutional, it is not only necessary that all persons brought under its influence are treated alike under the same conditions, but it must bring within its influence all who are under the same conditions, and not bring within its influence those who are under different conditions. *Mo. Pac. Railway* v. *Mackey*, 127 U. S. 205; *Johnson* v. *St. Paul & Duluth R. R. Co.*, 8 L. R. A. 419; *Ballard* v. *Oil Co.*, 81 Mississippi, 507.

Some of the state courts have held employers' liability acts constitutional, even though couched in general language, and applicable to all characters of business, whether hazardous or not, this result being attained in most instances by construing such statutes, notwithstanding their general language, to apply only to hazardous occupations; but such construction is not countenanced by the Federal authorities. *Lochner* v. *New York*, 198 U. S. 45, 59.

This court, when not bound by a limiting state court construction, will investigate for itself the reasonableness of a classification, made by a state legislature, and unless the classification is natural and reasonable, will hold the act void. It will undoubtedly exercise the same power when an act of Congress is before it. *Gulf, Colorado & Santa Fé R. R. Co.* v. *Ellis*, 165 U. S. 150; *Atchison &c. Railroad* v. *Matthews*, 174 U. S. 96.

The importance of this case cannot be overstated. The act raises constitutional questions of the utmost gravity. No one would question that a decision sustaining it must necessarily extend the power of the Federal Government over a field hitherto not contemplated as within its jurisdiction. A decision holding the act unconstitutional, would not destroy any generally prevailing understanding as to the relations between the several States and the United States; nor would such a decision open up any wide field for serious conjecture or apprehension.

No one, however versed in the science of government and the teachings of history, can forecast the changes that the establishment of the principle involved will work in our state and National life, or what kind of government we will have, when these principles thus sanctioned shall hereafter be invoked and applied.

From the account of the debates in Congress it appears that in both Houses it was understood that the act applied to all commerce. See Record, January 30, 1906, Vol. 40, Pt. 2, 1747; Pt. 5, 4602 *et seq.*

*Mr. Alexander P. Humphrey*, with whom *Mr. R. S. Lovett* and *Mr. Maxwell Evarts* were on the brief, for defendant in error in No. 222:

The Employers' Liability Act is unconstitutional. It is not competent for Congress to regulate all the commerce of a common carrier whether interstate or intrastate. If the line of a carrier is wholly within a State it carries on intrastate commerce, but may in connection with other carriers carry on interstate commerce. *C., N. O. & T. P. Railway* v. *Int. Com. Comm.*, 162 U. S. 191. The power which Congress has is to regulate commerce and there is a marked distinction between that power and a power to regulate the affairs of an individual or corporation engaged in interstate commerce. If Congress has power to pass this law it derives it from §.3 of Article VIII of the Constitution, the commerce clause. As to

the limit of this power, see *Gibbons* v. *Ogden*, 9 Wheat. 1, 194; *Trade-Mark Cases*, 100 U. S. 82, 96; *Wabash Railway* v. *Illinois*, 118 U. S. 565. And see the cases cited in the brief for defendant in error in No. 216, holding that a carrier engaged generally in interstate commerce is subject to state control as to its intrastate business. See also *Hall* v. *DeCuir*, 95 U. S. 485; *Louisville Railway* v. *Mississippi*, 133 U. S. 587; *Plessy* v. *Ferguson*, 163 U. S. 537; *Ches. & Ohio* v. *Kentucky*, 179 U. S. 388, holding that it is competent for a State to separate the races into separate compartments or cars so long as such state regulations are confined to intrastate points. As to power of the State to require railroad trains to stop at state stations, see *Gladson* v. *Minnesota*, 166 U. S. 427, 430; *Illinois Central R. R. Co.* v. *Illinois*, 163 U. S. 142; *Lake Shore Railway* v. *Ohio*, 173 U. S. 285; *C. C. C. & St. L. Railway* v. *Illinois*, 177 U. S. 514.

As to power of States over rates see *Louisville & Nashville* v. *Kentucky*, 183 U. S. 503; *Louisville & Nashville R. R. Co.* v. *Eubank*, 184 U. S. 27.

If determining the liability of a carrier to its employés is a regulation of commerce at all, Congress can only determine it so far as it relates to interstate commerce.

The Employers' Liability Act is not a regulation of commerce at all. It relates simply to one of the ordinary relations of life—and the legal rules affecting such relations are within the control of the States. Under the common law there is no remedy where an individual having been injured through the negligence of another dies after the hurt. *Insurance Co.* v. *Brame*, 95 U. S. 754; *The Harrisburg*, 119 U. S. 199, 204. Every State, however, has passed laws giving the personal representatives of the injured employé an action against the employer—and this has been done as a matter of purely domestic concern. The States have also, as they have the right to do, passed statutes as to the effect of negligence by fellow-servants; *Southern Pacific Ry. Co.* v. *Schoer*, 114 Fed. Rep. 466, 470; *Mo. Pac. Ry. Co.* v. *Mackey*, 127 U. S. 206;

*Minn. & St. Louis Ry. Co.* v. *Herrick,* 127 U. S. 210; *Chicago &c. R. R. Co.* v. *Pontius,* 157 U. S. 210; *Tullis* v. *Lake Erie & Western Ry.,* 175 U. S. 348; also as to the fencing of tracks and prevention of fires by interstate carriers, all of which have been sustained by this court. *Mo. Pac. Ry.* v. *Humes,* 115 U. S. 513; *Minneapolis Railway* v. *Beckwith,* 129 U. S. 26; *M. & St. L. Ry.* v. *Emmons,* 149 U. S. 364; *St. Louis & San Francisco Ry.* v. *Matthews,* 165 U. S. 1.

When cases have come to this court involving the question whether a particular state law is a regulation of interstate commerce, the question has been: Does the state law put a burden on interstate traffic? Examples of these cases are found in *Brown* v. *Maryland,* 12 Wheat. 420; *Leisy* v. *Hardin,* 135 U. S. 100; *Robbins* v. *Taxing District of Shelby,* 120 U. S. 489. Or the question has been: Does the state law place a burden on interstate transportation? Examples of this class are found in *Gibbons* v. *Ogden,* 9 Wheat. 1, 189, 196; *Crandall* v. *Nevada,* 6 Wall. 35; *Wabash R. R.* v. *Illinois,* 118 U. S. 557.

The act is simply a bold attempt to regulate one of the ordinary relations of life, that of master and servant, a relation hitherto supposed to be entirely within the control of the State. If Congress can thus take hold of the relation of master and servant, it can with equal power take hold of the relation of guardian and ward and other domestic relations.

This law is different from the Anti-trust Law, the Meat Inspection Law and the Pure Food Law, the Interstate Commerce Law, and the Safety Appliance Law, in that those laws regulate the instrumentalities of commerce and not domestic relations, and this act does not prescribe any rule by which it is to be governed or intercourse carried on.

Although some of the cases sustaining congressional legislation as to liability of shipowners have been based on the commerce clause the real basis of power in that respect is the admiralty and maritime clause of the Constitution. See *Ex parte Garnett,* 141 U. S. 1; *The Roanoke,* 189 U. S. 185; *The Belfast,* 7 Wall. 624, 640; *People* v. *Knight,* 171 N. Y 354, 364;

*S. C.*, affirmed 192 U. S. 21, and see cases in briefs of other counsel. *Robertson* v. *Baldwin*, 165 U. S. 275, distinguished.

The act embraces employés of all kinds, and it being separable was the evident intention of Congress not to confine the act to any class of employés, but to embrace all of the employés of a carrier within the terms of the act. This brings it under the rule that statutes partly constitutional and partly unconstitutional, are entirely void unless the unconstitutional can be plainly separated from the constitutional provision. *United States* v. *Reese*, 92 U. S. 214; *Baldwin* v. *Franks*, 120 U. S. 678; *Virginia Coupon Cases*, 114 U. S. 269, 304; *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601; *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540; *Illinois Central* v. *McKendree*, 203 U. S. 514; *Trade-mark Cases*, 100 U. S. 82.

MR. JUSTICE WHITE delivered the opinion of the court.[1]

To dispose of these cases it is necessary to decide a fundamental question which is equally decisive as to both. They were argued at the bar together, and because of their unity have been considered at the same time.

As stated in the declarations as finally amended, recovery was sought in each case of damages occasioned by the death of the respective intestates while serving as a fireman on a locomotive actually engaged in moving an interstate commerce train. In each of the cases it was alleged that the intestate met his death through no fault of his, but solely through the fault of employés of the company, who were his fellow servants. In both the right of action was expressly based upon the act of Congress of July 11, 1906, entitled "An Act relating to liability of common carriers in the District of Columbia and Territories and common carriers engaged in commerce between the States and between the States and foreign nations to their employés." By demurrer in each of the cases the act relied upon was assailed as being repugnant to the Constitution of

---

[1] See note at foot of page 464, *ante.*

the United States. In both cases the Department of Justice, on behalf of the United States, asked to be allowed to intervene for the purpose of supporting the constitutionality of the act. In the first (the *Howard*) case this request was granted. In the second (the *Brooks*) case the court, while denying the request upon the ground that it knew of no law authorizing such an intervention simply because the validity of an act of Congress was drawn in question, nevertheless permitted the United States to be heard as a friend of the court. In both cases the act was held to be unconstitutional, the demurrer was sustained and the declarations dismissed. These direct writs of error were then prosecuted, and at bar the cases have been argued, by printed brief and orally, not only by the parties in interest, but on behalf of the United States through the Attorney General as a friend of the court.

As the issue to be decided is whether the courts below were right in holding that the act of Congress, which was the basis of the respective causes of action, was repugnant to the Constitution of the United States, we reproduce the text of that act in the margin.[1]

---

[1] CHAPTER 3073. An act relating to liability of common carriers in the District of Columbia and Territories and common carriers engaged in commerce between the States and between the States and foreign nations to their employés. 32 Stat. 232.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That every common carrier engaged in trade or commerce in the District of Columbia, or in any Territory of the United States, or between the several States, or between any Territory and another, or between any Territory or Territories and any State or States, or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, shall be liable to any of its employés, or, in the case of his death, to his personal representative for the benefit of his widow and children, if any; if none, then for his parents; if none, then for his next of kin dependent upon him, for all damages which may result from the negligence of any of its officers, agents, or employés, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, ways or works.

SEC. 2. That in all actions hereafter brought against any common carriers to recover damages for personal injuries to an employé, or where such

Before coming to consider the contentions concerning the constitutionality of the act, we notice certain suggestions which proceed upon the assumption that they may concern the issue for decision.   It is said that the statute inordinately extends the power of Congress and unduly diminishes the legislative authority of the States, since it seeks to exert the power of Congress as to the relation of master and servant, a subject hitherto treated as being exclusively within the control of the States, and that in practice its execution will cripple the State and enlarge the Federal judicial power, since its effect will be to cause every action concerning an injury to a servant employed by a common carrier who may engage in interstate commerce to cease to be a matter of state jurisdiction and to be cognizable in the Federal courts.   Moreover, it is said, the statute will create confusion and uncertainty as to the rights of those dwelling within the States, that it will operate injuriously upon all who choose to engage in interstate commerce

injuries have resulted in his death, the fact that the employé may have been guilty of contributory negligence shall not bar a recovery where his contributory negligence was slight and that of the employer was gross in comparison, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé.   All questions of negligence and contributory negligence shall be for the jury.

SEC. 3. That no contract of employment, insurance, relief, benefit, or indemnity for injury or death entered into by or on behalf of any employé, nor the acceptance of any such insurance, relief, benefit, or indemnity by the person entitled thereto, shall constitute any bar or defense to any action brought to recover damages for personal injuries to or death of such employé: *Provided however,* That upon the trial of such action against any common carrier the defendant may set off therein any sum it has contributed toward any such insurance, relief, benefit, or indemnity that may have been paid to the injured employé, or in case of his death to his personal representative.

SEC. 4. That no action shall be maintained under this act unless commenced within one year from the time the cause of action accrued.

SEC. 5. That nothing in this act shall be held to limit the duty of common carriers by railroads or impair the rights of their employés under the safety-appliance act of March second, eighteen hundred and ninety-three, as amended April first, eighteen hundred and ninety-six, and March second, nineteen hundred and three.

Approved, June 11, 1906.

as a common carrier, since those who so do will become sub-
ject to the liability which the statute creates, to be tested by
the rules of negligence which the statute embodies, although
such rules be unknown to the laws of the several States. Be-
sides, the statute, it is urged, discriminates against all who
engage as common carriers in interstate commerce, since it
makes them responsible without limit as to the amount to one
servant for an injury suffered by the acts of a co-servant, even
in a case where the negligence of the injured servant has con-
tributed to the result, hence placing all employers who are
common carriers in a disfavored and all their employés in a
favored class. Indeed it is insisted the statute proceeds upon
contradictory principles, since it imposes the increased responsi-
bility just stated upon the master presumably in order to make
him more careful in the selection of his servants, and yet
minimizes the necessity for care on the part of the servant by
allowing recovery, although he may have been negligent.

But, without even for the sake of argument conceding the
correctness of these suggestions, we at once dismiss them from
consideration as concerning merely the expediency of the act
and not the power of Congress to enact it. We say this since,
in testing the constitutionality of the act, we must confine
ourselves to the power to pass it and may not consider evils
which it is supposed will arise from the execution of the law,
whether they be real or imaginary.

All the questions which arise concern the nature and extent
of the power of Congress to regulate commerce. That subject
has been so often here considered and has been so fully elabo-
rated in recent decisions, two of which are noted in the margin,[1]
that we content ourselves, for the purposes of this case, with
repeating the broad definition of the commerce power as ex-
pounded by Mr. Chief Justice Marshall in *Gibbons* v. *Ogden*,
9 Wheat. 1, 196, where he said:

"We are now arrived at the inquiry, What is this power?

---

[1] *Lottery Case,* 188 U. S. 321, 345 *et seq.; Northern Securities Co.* v. *United
States,* 193 U. S. 197, 335, and cases cited.

It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. . . . . If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several States, is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States."

Accepting, as we now do and as has always been done, this comprehensive statement of the power of Congress, we also adopt and reiterate the perspicuous statement made in the same case (p. 194), of those matters of state control which are not embraced in the grant of authority to Congress to regulate commerce:

"It is not intended to say that these woius comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient and is certainly unnecessary. Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one. . . . The genius and character of the whole Government seem to be, that its action is to be applied to all the external concerns of the Nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the Government."

We think the orderly discussion of the question may best be met oy disposing of the affirmative propositions relied on to establish that the statute conflicts with the Constitution.

In the first place, it is asserted that there is a total want of power in Congress in any conceivable aspect to regulate the subject with which the act deals. In the second place it is insisted the act is void, even although it be conceded, for the sake of argument, that some phases of the subject with which it is concerned may be within the power of Congress, because the act is confined not to such phases, but asserts control over many things not in any event within the power to regulate commerce.

While it may be, if we indulged, for the sake of argument, in the hypothesis of limited power upon which the second proposition rests, it would result that a consideration of the first proposition would be unnecessary because the act would be found to be repugnant to the Constitution, because embracing provisions beyond such assumed and restricted authority we do not think we are at liberty to avoid deciding whether, in any possible aspect, the subject to which the act relates is within the power of Congress. We say this, for if it be that from the nature of the subject no power whatever over the same can, under any conceivable circumstances, be possessed by Congress, we ought to so declare, and not by an attempt to conceive the inconceivable assume the existence of some authority, thus it may be, misleading Congress and giving rise to future contention.

.1. The proposition that there is an absolute want of power in Congress to enact the statute is based on the assumption that as the statute is solely addressed to the regulation of the relations of the employer to those whom he employs and the relation of those employed by him among themselves, it deals with subjects which cannot under any circumstances come within the power conferred upon Congress to regulate commerce.

As it is patent that the act does regulate the relation of master and servant in the cases to which it applies, it must follow, that the act is beyond the authority of Congress if the proposition just stated be well founded. But we may not

test the power of Congress to regulate commerce solely by abstractly considering the particular subject to which a regulation relates, irrespective of whether the regulation in question is one of interstate commerce. On the contrary, the test of power is not merely the matter regulated, but whether the regulation is directly one of interstate commerce, or is embraced within the grant conferred on Congress to use all lawful means necessary and appropriate to the execution of the power to regulate commerce. We think the unsoundness of the contention, that because the act regulates the relation of master and servant, it is unconstitutional, because under no circumstances and to no extent can the regulation of such subject be within the grant of authority to regulate commerce, is demonstrable. We say this because we fail to perceive any just reason for holding that Congress is without power to regulate the relation of master and servant, to the extent that regulations adopted by Congress on that subject are solely confined to interstate commerce, and therefore are within the grant to regulate that commerce or within the authority given to use all means appropriate to the exercise of the powers conferred. To illustrate: Take the case of an interstate railway train, that is, a train moving in interstate commerce, and the regulation of which therefore is, in the nature of things, a regulation of such commerce. It cannot be said that because a regulation adopted by Congress as to such train when so engaged in interstate commerce deals with the relation of the master to the servants operating such train or the relations of the servants engaged in such operation between themselves, that it is not a regulation of interstate commerce. This must be, since to admit the authority to regulate such train, and yet to say that all regulations which deal with the relation of master and servants engaged in its operation are invalid for want of power would be but to concede the power and then to deny it, or at all events to recognize the power and yet to render it incomplete.

Because of the reasons just stated we might well pass from the consideration of the subject. We add, however, that we

think the error of the proposition is shown by previous decisions of this court. Thus the want of power in a State to interfere with an interstate commerce train, if thereby a direct burden is imposed upon interstate commerce, is settled beyond question. *Mississippi R. R. Co. v. Illinois Cent. R. R.*, 203 U. S. 335, 343, and cases cited; *Atlantic Coast Line R. R. v. Wharton et al., Railroad Commissioners*, 207 U. S. 328. And decisions cited in the margin,[1] holding that state statutes which regulated the relation of master and servant were applicable to those actually engaged in an operation of interstate commerce, because the state power existed until Congress acted, by necessary implication, refute the contention that a regulation of the subject, confined to interstate commerce, when adopted by Congress would be necessarily void because the regulation of the relation of master and servant was, however intimately connected with interstate commerce, beyond the power of Congress. And a like conclusion also persuasively results from previous rulings of this court concerning the act of Congress, known as the Safety Appliance Act. *Johnson v. Southern Pacific Co.*, 196 U. S. 1; *Schlemmer v. Buffalo, Rochester &c. Ry.*, 205 U. S. 1.

2. But it is argued, even though it be conceded that the power of Congress may be exercised as to the relation of master and servant in matters of interstate commerce, that power cannot be lawfully extended so as to include the regulation of the relation of master and servant, or of servants among themselves, as to things which are not interstate commerce. From this it is insisted the repugnancy of the act to the Constitution is clearly shown, as the face of the act makes it certain that the power which it asserts extends not only to the relation of master and servant and servants among themselves as to things which are wholly interstate commerce, but em-

---

[1] *Sherlock v. Alling*, 93 U. S. 99; *Missouri Pacific Ry. Co. v. Mackey*, 127 U. S. 205; *Minneapolis &c. Ry. Co. v. Herrick*, 127 U. S. 210; *Chicago &c. Ry. Co. v. Pontius*, 157 U. S. 209; *Tullis v. Lake Erie & W. R. R.*, 175 U. S. 348.

braces those relations as to matters and things domestic in their character and which do not come within the authority of Congress. To test this proposition requires us to consider the text of the act.

From the first section it is certain that the act extends to every individual or corporation who may engage in interstate commerce as a common carrier. Its all-embracing words leave no room for any other conclusion. It may include, for example, steam railroads, telegraph lines, telephone lines, the express business, vessels of every kind, whether steam or sail, ferries, bridges, wagon lines, carriages, trolley lines, etc. Now, the rule which the statute establishes for the purpose of determining whether all the subjects to which it relates are to be controlled by its provisions is that any one who conducts such business be a "common carrier engaged in trade or commerce in the District of Columbia, or in any Territory of the United States, or between the several States," etc. That is, the subjects stated all come within the statute when the individual or corporation is a common carrier who engages in trade or commerce between the States, etc. From this it follows that the statute deals with all the concerns of the individuals or corporations to which it relates if they engage as common carriers in trade or commerce between the States, etc., and does not confine itself to the interstate commerce business which may be done by such persons. Stated in another form, the statute is addressed to the individuals or corporations who are engaged in interstate commerce and is not confined solely to regulating the interstate commerce business which such persons may do— that is, it regulates the persons because they engage in interstate commerce and does not alone regulate the business of interstate commerce.

And the conclusion thus stated, which flows from the text of the act concerning the individuals or corporations to which it is made to apply, is further demonstrated by a consideration of the text of the statute defining the servants to whom it relates.

Thus the liability of a common carrier is declared to be in favor of "any of its employés." As the word "any" is unqualified, it follows that liability to the servant is coextensive with the business done by the employers whom the statute embraces; that is, it is in favor of any of the employés of all carriers who engage in interstate commerce. This also is the rule as to the one who otherwise would be a fellow servant, by whose negligence the injury or death may have been occasioned, since it is provided that the right to recover on the part of any servant will exist, although the injury for which the carrier is to be held resulted from "the negligence of any of its officers, agents or employés."

The act then being addressed to all common carriers engaged in interstate commerce, and imposing a liability upon them in favor of any of their employés, without qualification or restriction as to the business in which the carriers or their employés may be engaged at the time of the injury, of necessity includes subjects wholly outside of the power of Congress to regulate commerce. Without stopping to consider the numerous instances where although a common carrier is engaged in interstate commerce such carrier may in the nature of things also transact business not interstate commerce, although such local business may indirectly be related to interstate commerce, a few illustrations showing the operation of the statute as to matters wholly independent of interstate commerce will serve to make clear the extent of the power which is exerted by the statute. Take a railroad engaged in interstate commerce, having a purely local branch operated wholly within a State. Take again the same road having shops for repairs, and it may be for construction work, as well as a large accounting and clerical force, and having, it may be, storage elevators and warehouses, not to suggest besides the possibility of its being engaged in other independent enterprises. Take a telegraph company engaged in the transmission of interstate and local messages. Take an express company engaged in local as well as in interstate business. Take a trolley line

moving wholly within a State as to a large part of its business and yet as to the remainder crossing the state line.

As the act thus includes many subjects wholly beyond the power to regulate commerce and depends for its sanction upon that authority, it results that the act is repugnant to the Constitution, and cannot be enforced unless there be merit in the propositions advanced to show that the statute may be saved.

On the one hand, while conceding that the act deals with all common carriers who are engaged in interstate commerce because they so engage, and indeed, while moreover conceding that the act was originally drawn for the purpose of reaching all the employés of railroads engaged in interstate commerce to which it is said the act in its original form alone related, it is yet insisted that the act is within the power of Congress, because one who engages in interstate commerce thereby comes under the power of Congress as to all his business and may not complain of any regulation which Congress may choose to adopt. These contentions are thus summed up in the brief filed on behalf of the Government:

"It is the *carrier* and not its employés that the act seeks to regulate, and the carrier is subject to such regulations because it is engaged in interstate commerce.

&ast;      &ast;      &ast;      &ast;      &ast;      &ast;      &ast;      &ast;

"By engaging in interstate commerce the carrier chooses to subject itself and its business to the control of Congress, and cannot be heard to complain of such regulations.

". . . It is submitted that Congress can make a common carrier engaged in interstate commerce liable to *any one* for its negligence who is affected by it; and if it can do that, necessarily it can make such carrier liable to all of its employés."

On the other hand, the same brief insists that these propositions are irrelevant, because the statute may be interpreted so as to confine its operation wholly to interstate commerce or to means appropriate to the regulation of that subject, and hence relieves from the necessity of deciding whether, if the statute could not be so construed, it would be constitutional.

In the oral discussion at bar this latter view was earnestly insisted upon by the Attorney General. ·Assuming, as we do, that the propositions are intended to be alternative, we disregard the order in which they are pressed in argument, and therefore pass for a moment the consideration of the proposition that the statute is constitutional, though it includes all the subjects which we have found it to embrace, in order to weigh the contention that it is susceptible on its face of a different meaning from that which we have given it, or that such result can be accomplished by the application of the rules of interpretation which are relied upon.

So far as the face of the statute is concerned, the argument is this, that because the statute says carriers engaged in commerce between the States, etc., therefore the act should be interpreted as being exclusively applicable to the interstate commerce business and none other of such carriers, and that the words "any employé" as found in the statute should be held to mean any employé when such employé is engaged only in interstate commerce. But this would require us to write into the statute words of limitation and restriction not found in it. But if we could bring ourselves to modify the statute by writing in the words suggested the result would be to restrict the operation of the act as to the District of Columbia and the Territories. We say this because immediately preceding the provision of the act concerning carriers engaged in commerce between the States and Territories is a clause making it applicable to "every common carrier engaged in trade or commerce in the District of Columbia or in any Territory of the United States." It follows, therefore, that common carriers in such Territories, even although not engaged in interstate commerce, are by the act made liable to "any" of their employés, as therein defined. The legislative power of Congress over the District of Columbia and the Territories being plenary and not depending upon the interstate commerce clause, it results that the provision as to the District of Columbia and the Territories, if standing alone, could not be ques-

tioned. Thus it would come to pass, if we could bring ourselves
to modify the statute by writing in the words suggested; that
is, by causing the act to read "any employé when engaged in
interstate commerce," we would restrict the act as to the Dis-
trict of Columbia and the Territories, and thus destroy it in
an important particular. To write into the act the qualifying
words, therefore, would be but adding to its provisions in order
to save it in one aspect, and thereby to destroy it in another;
that is, to destroy in order to save and to save in order to
destroy.

The principles of construction invoked are undoubted, but
are inapplicable. Of course, if it can be lawfully done, our
duty is to construe the statute so as to render it constitutional.
But this does not imply, if the text of an act is unambiguous,
that it may be rewritten to accomplish that purpose. Equally
clear is it, generally speaking, that where a statute contains
provisions which are constitutional and others which are not,
effect may be given to the legal provisions by separating them
from the illegal. But this applies only to a case where the pro-
visions are separable and not dependent one upon the other,
and does not support the contention that that which is in-
divisible may be divided. Moreover, even in a case where
legal provisions may be severed from those which are illegal, in
order to save the rule applies only where it is plain that Con-
gress would have enacted the legislation with the unconsti-
tutional provisions eliminated. All these principles are so
clearly settled as not to be open to controversy. They were all,
after a full review of the authorities, restated and reapplied in
a recent case. *Illinois Central Railroad* v. *McKendree*, 203
U. S. 514, and authorities there cited.

As the act before us by its terms relates to every common
carrier engaged in interstate commerce and to any of the em-
ployés of every such carrier, thereby regulating every relation
of a carrier engaged in interstate commerce with its servants
and of such servants among themselves, we are unable to say
that the statute would have been enacted had its provisions

been restricted to the limited relations of that character which it was within the power of Congress to regulate. On this subject the opinion in the *Trade-mark Cases,* 100 U. S. 82, where an act of Congress concerning trade-marks was held to be unconstitutional, because too broad in its scope, is pertinent and instructive. The court said (p. 99):

"If we should, in the case before us, undertake to make by judicial construction a law which Congress did not make, it is quite probable we should do what, if the matter were now before that body, it would be unwilling to do; namely, make a trade-mark law which is only · partial in its operation, and which would complicate the rights which parties would hold, in some instances under the act of Congress, and in others under state law. Cooley, Const. Lim. 178, 179; *Commonwealth* v. *Hitchings,* 5 Gray (Mass.), 482."

3. It remains only to consider the contention which we have previously quoted, that the act is constitutional, although it embraces subjects not within the power of Congress to regulate commerce, because one who engages in interstate commerce thereby submits all his business concerns to the regulating power of Congress. To state the proposition is to refute it. It assumes that because one engages in interstate commerce he thereby endows Congress with power not delegated to it by the Constitution, in other words, with the right to legislate concerning matters of purely state concern. It rests upon the conception that the Constitution destroyed that freedom of commerce which it was its purpose to preserve, since it treats the right to engage in interstate commerce as a privilege which cannot be availed of except upon such conditions as Congress may prescribe, even although the conditions would be otherwise beyond the power of Congress. It is apparent that if the contention were well founded it would extend the power of Congress to every conceivable subject, however inherently local, would obliterate all the limitations of power imposed by the Constitution, and would destroy the authority of the States as to all conceivable matters which from the beginning

have been, and must continue to be, under their control· so long as the Constitution endures.

4. Reference was made to the report of a committee submitted to the House of Representatives on the coming in of the bill which finally became the act in question. We content ourselves on this subject with saying that that report, we think, instead of adding force to the argument that the plain terms of the act should be disregarded, tends to the contrary. And the same observation is appropriate to the reference made to the text of the Safety Appliance Act of March 2, 1893, 27 Stat. 531, which, it is insisted, furnishes a guide which, if followed, would enable us to disregard the text of the act. We say this because the face of that act clearly refutes the argument based upon it. It is true that the act, like the one we are considering, is addressed to every common carrier engaged in interstate commerce, but this direction is followed by provisions expressly limiting the scope and effect of the act to interstate commerce, which are wholly superfluous if the argument here made concerning the statute before us be sound.

We deem it unnecessary to pass upon the merits of the contentions concerning the alleged repugnancy of the statute, if regarded as otherwise valid, to the due process clause of the Fifth Amendment to the Constitution, because the act classifies together all common carriers. Although we deem it unnecessary to consider that subject, it must not be implied that we question the correctness of previous decisions noted in the margin,[1] wherein state statutes were held not to be repugnant to the Fourteenth Amendment, although they classified steam railroads in one class for the purpose of applying a rule of master and servant. We further deem it unnecessary to express an opinion concerning the alleged repugnancy of the statute to the Seventh Amendment, because of the provision of the act as to the power of the jury. In saying this, however, we must not be considered as intimating that we think

[1] *Missouri Pacific Ry. Co.* v. *Mackey*, 127 U. S. 205; *Minneapolis &c. Ry. Co.* v. *Herrick*, 127 U. S. 210; *Chicago &c. R. R.* v. *Pontius*, 157 U. S. 209.

the provision in question is susceptible of the construction placed on it in argument, or that if it could be so construed it would be constitutional.

Concluding, as we do, that the statute, whilst it embraces subjects within the authority of Congress to regulate commerce, also includes subjects not within its constitutional power, and that the two are so interblended in the statute that they are incapable of separation, we are of the opinion that the courts below rightly held the statute to be repugnant to the Constitution and non-enforcible; and the judgments below are, therefore,

*Affirmed.*

Mr. Justice Day concurs in this opinion.

Mr. Justice Peckham, concurring.

I concur in the result of the foregoing opinion, but I am not prepared to agree with all that is stated as to the power of Congress to legislate upon the subject of the relations between master and servant.

I concur in the proposition, that as to traffic or other matters within the State, the act is unconstitutional, and it cannot be separated from that part which is claimed to be valid as relating to interstate commerce. As that is all that it is necessary to decide in this case, I place my concurrence upon that part of the opinion which decides it.

I am authorized to state that the Chief Justice and Mr. Justice Brewer agree in this view.

Mr. Justice Moody, dissenting.

I am unable to agree in the judgment of the court. Under ordinary circumstances, where the judgment rests exclusively, as it does here, upon a mere interpretation of the words of a law, which may be readily changed by the lawmaking branches of the Government, if they be so minded, a difference of opin-

ion may well be left without expression. But where the judgment is a judicial condemnation of an act of a coördinate branch of our Government it is so grave a step that no member of the court can escape his own responsibility, or be justified in suppressing his own views, if unhappily they have not found expression in those of his associates. Moved by this consideration, and solicitous to maintain what seem to me the lawful powers of the Nation, I have no doubt of my duty to disclose fully the opinions which, to my regret, differ in some respects from those of some of my brethren.

The only question which these cases present is the constitutionality of the Employers' Liability Act, which, briefly stated, provides a remedy for the injury or death of the employés of territorial, interstate and foreign common carriers, caused by the negligence of the carrier. The defendants were both interstate carriers, and these actions were brought to recover for the deaths of their employés who, at the time, were engaged in interstate transportation. The judgment of the court does not deny that it is within the power of the Congress to provide a remedy for the injury or death of employés engaged in the conduct of territorial, interstate and foreign commerce. It rests upon the ground that this statute is unconstitutional, because it seeks to do more than that, and regulates the liability of employers while engaged in intrastate commerce or in manufacture. At the threshold I may say that I agree that the Congress has not the power directly to regulate the purely internal commerce of the States, and that I understand that to be the opinion of every member of the court.

The constitutionality of the act was attacked in the arguments before us upon three grounds. First, because it seeks to control by provisions so inseparable that they are incapable of resolution into their several parts, not only the territorial, foreign and interstate business of carriers, but also their intrastate business, which, by the Constitution, is reserved for the government of the States. Second, because, if the act should

be interpreted as not intruding upon the domain of the States by directly regulating commerce exclusively within the States, yet, that legislation fixing the obligation of employers engaged in interstate and foreign commerce to their employés in such commerce, for injuries suffered by the latter in the course of the employment, is not the regulation of commerce, and, therefore, is not within any power conferred by the Constitution upon Congress. Third, because, even if the act is concerned with a subject which is within the power of Congress, yet the specific changes made by it in the common law rules governing the relations of employer and employé exceed the legislative power or violate the constitutional prohibitions which restrict that power.

I am of opinion that the act is not open to any of the constitutional objections urged against it, and shall consider all of the objections in the order in which I have stated them.

In the consideration of the scope of the statute for the purpose of determining whether it seeks to control that part of commerce which is beyond the power of Congress and subject only to the government of the States, it is to be observed that the opening words of Congress are in recognition of the limitation of its authority and of the constitutional distinction between commerce among the States and with foreign nations on the one hand and commerce within the States on the other hand. The commands of the law are addressed only to "common carriers engaged in trade and commerce" in the Territories, with foreign nations, and among the States, and with respect to carriers engaged in commerce within the States the law is impressively silent. The expression and enumeration of the parts of commerce which are clearly within the control of Congress is equivalent to an exclusion of the part which is not within its control. In the careful selection of the language of this law the legislators may well have had in mind the words of Chief Justice Marshall which have received the constant approval of this court. He said (in *Gibbons* v. *Ogden*, 9 Wheat. 1, 194, 195)·

"The subject to which the power is next applied is to 'commerce among the several States.'  . . .  Commerce among the States cannot stop at the external boundary line of each State, but may be introduced into the interior.

"It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient, and is certainly unnecessary.

"Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of a State, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce to which the power was to be extended would not have been made had the intention been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State. The genius and character of the whole Government seem to be, that its action is to be applied to all the external concerns of the Nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the Government. The completely internal commerce of a State then, may be considered as reserved to the State itself."

These words of the Chief Justice have been regarded as delimiting accurately the constitutional boundaries of the respective powers over commerce of the Nation and the States. They have been frequently repeated, and, though differences have arisen in their application to the complicated affairs of mankind, never doubted, and universally approved. It is not

easy to believe that Congress intended to dispute their authority. The reasoning which was thought worthy for the interpretation of the Constitution will not be misapplied if it be employed in the interpretation of a law passed in pursuance of the powers conferred by the Constitution. Why should it not be said of the law as it was said of the Constitution, that "the enumeration of the particular classes of commerce to which the power was to be extended, would not have been made had the intention been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language, . . . must be the exclusively internal commerce of the State." From the enumeration of territorial, interstate, and foreign commerce, and the omission of the internal commerce of the State, is it not clear that the commerce which is exclusively internal to the State, and does not affect any other character of commerce, was intended to be outside the purview of the law? Does not a proper respect for the acts of Congress and the strong presumption that it will not exceed its powers, so frequently declared by this court, require us to believe that when the kinds of commerce within its undoubted control are carefully enumerated all the words of the law, however general, are to be referred solely to that commerce and no other?

If carriers were separated by a clear line of division, so that one class were engaged exclusively in interstate and foreign commerce, and the other class were engaged exclusively in commerce within the States, it would not, of course, occur to any mind that this act had any reference whatever to the state carriers. But there is no such hard and fast line of division. Carriers often, and where they are railroads, usually are, as a matter of fact, engaged both in interstate and foreign commerce over which Congress has the control, and intrastate commerce over which the States have the control. Applying the law under consideration to the conditions as they actually exist, it is said that its words are so general and sweeping as

to comprehend within its benefits not only the employés of the interstate carrier engaged in the business of interstate carriage, but also the employés of the same carrier engaged in the business of intrastate carriage which it may and usually does conduct. Counsel illustrated their argument by suggesting that if a carrier doing an interstate business on the Pacific slope also conducted a local trolley line wholly along the Atlantic seaboard within a single State, an employé on the local trolley line would, by the terms of this act, be entitled to its benefits. If such be the necessary interpretation of the statute plainly it exceeds the power of Congress, for Congress certainly has no right to regulate the purely internal commerce of a State. Nor can the statute be saved by rejecting that part of it which is unconstitutional because its provisions are single and incapable of separation. The vicious part, if such exist, is so intermingled with that which is good that it cannot be eliminated without destroying the whole structure.

Which interpretation, then, should be adopted? That which regards the law as prescribing the liability of the carrier only to those employés who are engaged in the work of interstate and foreign commerce, or that which extends the benefits of the law also to those employés engaged in work which has no relation whatever to such commerce. In answering this question it must not be forgotten that, if the latter interpretation be adopted, in the opinion of the whole court the act is beyond the constitutional power of Congress. That is a consideration of vast importance, because the court has never exercised the mighty power of declaring the acts of a co-ordinate branch of the Government void except where there is no possible and sensible construction of the act which is consistent with the fundamental organic law. The presumption that other branches of the Government will restrain themselves within the scope of their authority, and the respect which is due to them and their acts, admits of no other attitude from this court. This is more than a canon of interpretation, it is a rule of conduct resting upon considerations of public

policy, and, in the exercise of the delicate function of condemning the acts of coördinate and equal branches of the Government, under the same obligation to respect the Constitution as ourselves, has been observed from the beginning. I regard the rule as so vital and fundamental in this and all other parts of the case that I select almost at random some expressions of it by different justices of this court. When the power to declare an act of Congress void was still undecided, Mr. Justice Chase said in *Hylton* v. *United States*, 3 Dall. 171, p. 175: "If the court have such power, I am free to declare that I will never exercise it, but in a very, clear case." Mr. Justice Strong said in *The Legal Tender Cases*, 12 Wall. 457, p. 531: "It is incumbent, therefore, upon those who affirm the unconstitutionality of an act of Congress to show clearly that it is in violation of the provisions of the Constitution. It is not sufficient for them that they succeed in raising a doubt." In *The Trade-Mark Cases*, 100 U. S. 82, Mr. Justice Miller said, p. 96: "When this court is called on in the course of the administration of the law to consider whether an act of Congress, or any other department of the Government, is within the constitutional authority of that department, a due respect for a coördinate branch of the Government requires that we shall decide that it has transcended its powers only when that is so plain that we cannot avoid the duty." In *Nicol* v. *Ames*, 173 U. S. 509, Mr. Justice Peckham said, p. 514: "It is always an exceedingly grave and delicate duty to decide upon the constitutionality of an act of the Congress of the United States. The presumption, as has frequently been said, is in favor of the validity of the act, and it is only when the question is free from any reasonable doubt that the court should hold an act of the lawmaking power of the Nation to be in violation of that fundamental instrument upon which all the powers of the Government rest." Mr. Justice White in *Buttfield* v. *Stranahan*, 192 U. S. 470, said, p. 492: "In examining the statute in order to determine its constitutionality we must be guided by the well-settled rule that every intendment is in favor of its validity.

It must be presumed to be constitutional, unless its repugnancy . to the Constitution clearly appears." `Mr. Chief Justice Waite in *The Sinking Fund Cases*, 99 U. S. 700, said, p. 718: "It is our duty, when required in the regular course of judicial proceedings, to declare an act of Congress void if not within the legislative power of the United States; but this declaratic' should never be made except in a clear case. Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the Government cannot encroach upon the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule." Mr. Justice Story, in *United States* v. *Coombs*, 12 Pet. 72, said, p. 76: "If the section admits of two interpretations, one of which brings it within and the other presses it beyond the constitutional authority of Congress, it will become our duty to adopt the former construction; because a presumption never ought to be indulged, that Congress meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the court by language altogether unambiguous."

Citations of this character might be multiplied, but to no good purpose. There is no doubt that the rule exists, there is no doubt that it is wise, and promotes the mutual respect between the different branches of the Government which is so essential to the welfare of all, and that it requires us, if it is within our power, to give to the words of the statute before us a meaning which will confine its provisions to subjects within the control of Congress. If two interpretations are possible our plain duty is to adopt that which sustains the statute as a lawful exercise of authority and not that which condemns it as a usurpation.

The argument which supports a construction of the statute which would include within its provisions intrastate commerce is readily stated. It is said that "every common carrier" engaged in territorial, foreign, or interstate trade is made

"liable to any of its employés   .   .   .    for all damages which may result from the negligence of any of its officers, agents, or employés, or by reason of any defect" in its instrumentalities, and that, as there is no qualification of or exception to the generality of the language descriptive of the employés or instrumentalities, it .must be deemed to include those engaged and used solely in intrastate commerce, and even in manufacture, as well as those engaged and used in other commerce. But I venture to think that this argument rests upon too narrow ground. It contemplates merely the words of the statute; it shuts out the light which the Constitution sheds upon them; it overlooks the significance of the enumeration of the kinds of commerce clearly within the National control and the omission of the commerce beyond that control—an enumeration and omission which characterizes, colors and restrains every word of the statute—and it neglects the presumptions in favor of the validity of the law and of the obedience of Congress to the commands of the Constitution, which cannot with propriety be disregarded by this court. Taking into account these missing aids to construction, it becomes quite easy, quite reasonable, and, in my opinion, quite necessary, to construe the act as conferring its benefits only upon employés engaged in some fashion in the commerce which is enumerated in it and is undoubtedly under the control of Congress. Even without these guides for discovering the intent of Congress, which the uniform practice of the court compels us to use, it is natural to suppose that, when territorial, interstate, and foreign carriers only are mentioned and every such carrier is declared to be liable "to any of its employés," only its employés in such commerce are intended. With those guides the conclusion appears to me irresistible, for they show that if the words, "any of its employés," in the context where they are used, are capable of meaning all of the employés upon any kind of work, yet their generality should be restrained. so as to include only those who are subject to the power of the lawmaking. body. The case of *McCullough* v. *Virginia*, 172

U. S. 102, is precisely in point here. An act of the General Assembly of the State of Virginia provided for refunding the state debt by the issue of coupon bonds for two-thirds of the total amount of that debt. It was enacted that the coupons should "be receivable at and after maturity for all taxes, debts, dues, and demands due the State." There was at the time of the passage of the refunding act a provision of the constitution of Virginia requiring all school taxes to be paid in cash, and it had been held by this court that the constitutional provision disabled the Virginia legislature from providing that the coupons should be receivable for such taxes. *McGahey* v. *Virginia*, 135 U. S. 662. The argument was then made that as the statute providing for the receivability of the coupons for "all taxes, debts, dues, and demands due the State" was in part beyond the constitutional power of the legislature, the contract evidenced by that statute was entirely void. The court, speaking by Mr. Justice Brewer, answered this argument by saying, 172 U. S. 112: "It ignores the difference between the statute and the contract, and confuses the two entirely distinct matters of construction and validity. The statute precedes the contract. Its scope and meaning must be determined before any question will arise as to the validity of the contract which it authorizes. It is elementary law that every statute is to be read in the light of the Constitution. However broad and general its language, it cannot be interpreted as extending beyond those matters which it was within the constitutional power of the legislature to reach. It is the same rule which obtains in the interpretation of any private contract between individuals. That, whatever may be its words, is always to be construed in the light of the statute; of the law then in force; of the circumstances and conditions of parties. So, although general language was introduced into the statute of 1871, it is not to be read as reaching to matters in respect to which the legislature had no constitutional power, but only as to those matters within its control. And if there were, as it seems there were, certain special taxes and dues

which under the existing provisions of the state constitution
could not be affected by legislative action, the statute is to
be read as though it in terms excluded them from its opera-
tion." The language quoted was not *obiter*. The case turned
upon the construction of the statute and reversed the con-
struction by the highest court of the State of its own statute,
as well as its judgment, that the statute thus construed was
inconsistent with the state constitution, because "all taxes"
included taxes beyond the power of the legislature. I am
unable to reconcile the judgment in that case with the con-
clusion which is reached by the court in this. The reasoning
which, in that case, led the court to construe a statute provid-
ing that the coupons should be receivable for "all taxes" to
mean only for such taxes as the legislature had the constitu-
tional power to declare payable in such a manner, is equally
potent to lead the court, in the case at bar, to construe a
statute providing for the liability of the interstate and foreign
carrier to "any of its employés" to mean only to any of its
employés for whom Congress has the constitutional power to
make such a provision. In that case there were taxes within
the legislative control, and taxes without the legislative con-
trol of the Virginia assembly; in this case there are employés
within the legislative control and employés without the legis-
lative control of Congress; in that case the statute provided
for "all taxes;" in this case the statute provides for "any
employés;" in that case, examining the statute "in the light
of the Constitution," this court declared that "however broad
and general its language, it cannot be interpreted as extend-
ing beyond those matters which it is within the constitutional
power of the legislature to reach," and if it appears that there
were taxes beyond the control of the legislature, that the stat-
ute should be read "as though it in terms excluded them from
its operation;" I am unable to imagine any reason why, ex-
amining the statute in this case with the aid of the same light,
the court should not make the same declaration of its meaning.
Moreover, it should be remembered that a circumstance lead-

ing in the same direction is present in the case at bar which was absent in that case, for, to repeat what has already been said, here the general words are used in a context which suggests, if it does not require, the less extended meaning.

It should be observed that the *McCullough case* was simply a case of construction. The court made no judicial amendment of the statute or exception from its provisions of any subject which came within them according to their proper meaning, ascertained with the aid of the light of the constitutional limits of the legislative power. Mr. Justice Brewer pointed out the distinction between the construction of the statute and its validity, saying: "The statute precedes the contract. Its scope and meaning must be determined before any question will arise as to the validity of the contract which it authorizes." Thus the case is distinguished from some others, much relied upon in the argument, which establish the proposition, that a single statutory provision is void if it is expressed in general words so used as to manifest clearly the intention to include within those words subjects beyond the constitutional power of the lawmaking body. The courts have no power to read into such a provision an exception for the purpose of saving that which is left from condemnation. A law which cannot endure the test of the Constitution without judicial amendment must perish. *United States* v. *Reese*, 92 U. S. 214; *The Trade-Mark Cases*, 100 U. S. 82; *United States* v. *Harris*, 106 U. S. 629; *Baldwin* v. *Franks*, 120 U. S. 678; *United States* v. *Ju Toy*, 198 U. S. 253. See *Illinois &c. Railroad* v. *McKendree*, 203 U. S. 514. But the rule derived from these cases is by no means decisive of the inquiry whether this statute must be construed as seeking to accomplish objects beyond the power of Congress. It can be made decisive only by begging the very question to be determined, and, in the words of Mr. Justice Brewer, confusing "the two entirely distinct matters of construction and validity." It merely expresses the judicial duty which arises after the question of construction is determined. A critical examination of the

cases shows that in each of them, in the opinion of the court, the language of the statute admitted of no possible interpretation, except that Congress intended to deal, by a single and inseparable provision, with subjects without as well as subjects within its control. As was said in one of them, *United States* v. *Reese*, 92 U. S. 214, 220, there was "no room for construction unless it be as to the effect of the Constitution." It would be unprofitable to dwell upon all these decisions, and I content myself with the analysis of one, and that the one deemed by counsel who rely upon it as the most important and conclusive. In *The Trade-mark cases* it appeared that in an act entitled "An Act to Revise, Consolidate, and Amend the Statutes Relating to Patents and Copyrights," provision was made for the registration of trade-marks in the Patent Office. Some years later an act was passed providing for the punishment by fine and imprisonment of any person making fraudulent use of or counterfeiting trade-marks thus registered. The cases were indictments under this later act, and the question for decision was its constitutionality. The act was supported first upon the ground that it was authorized by that part of the Constitution which confers upon Congress the authority "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective rights and discoveries." The court, after saying, 100 U. S. 93, "that it is a reasonable inference that this part of the statute also was in the opinion of Congress an exercise of the power found in that clause of the Constitution," and that "it was mainly if not wholly to this clause that the advocates of the law looked for its support," held that this clause was not a sufficient source of authority for the act. The act was supported, second, upon the ground that the commerce clause of the Constitution supplied the requisite authority to Congress. But there was not a word in the act from which it could be inferred that Congress intended to exercise the power conferred by the commerce clause. The court, by Mr. Justice Miller, after pointing out that

commerce within a State was beyond the control of Congress, said, p. 96: "When, therefore, Congress undertakes to enact a law, which can only be valid as a regulation of commerce, it is reasonable to expect to find on the face of the law, or from its essential nature, that it is a regulation of commerce with foreign nations, among the several States, or with the Indian tribes." Words could not be more happily chosen than these, to describe what the statute in the case at bar is on its face and from its essential nature. The justice then proceeds to say: "If it is not so limited it is in excess of the power of Congress. If its main purpose be to establish a regulation applicable to all trade, to commerce at all points, especially if it is apparent that it is designed to govern the commerce wholly between citizens of the same State, it is obviously the exercise of a power not confided to Congress." No words could be more happily chosen than these, to describe exactly what the statute in the case at bar is not. The court then taking the view, upon which there cannot be two opinions, that the act intended to establish a universal system of trade-mark legislation applicable to all commerce, held the statute void, saying, p. 98: "It is not within the judicial province to give to the words used by Congress a narrower meaning than that they are manifestly intended to bear, in order that crimes may be punished which are not described in language within the constitutional power of that body." The reasoning relied upon in this case to overthrow the statute, if applied to the statute before us, tends to support it.

I do not wish to be understood as saying that the group of cases I am now discussing does not furnish instances where the court has declined to limit the meaning of words in order to save the act. I only say, that in these cases it could not be done without violating the obvious intent of Congress as ascertained by the necessary meaning of the language it employed; in other words, that in these cases only one interpretation was possible and there was "no room for construction." They cannot be understood as deciding that general

words may not, in view of the context where they are found, and, with the aid of the light of the Constitution, be restrained in their meaning, with the purpose and effect of giving them such a construction that the act may be sustained as a legitimate exercise of the legislative power. If they should be so understood they would be in flat conflict with the *McCullough case,* and with the spirit of the interpretation that prevailed in *United States* v. *Palmer,* 3 Wheat. 610, and *Church of the Holy Trinity* v. *United States,* 143 U. S. 457. In the former case it was held that an act which punished certain offenses committed by "any person or persons" upon the high seas should not be construed as including persons who might commit such offenses on board a vessel belonging to the subjects of a foreign state; Marshall, C. J., saying, p. 631: "The words of the section are in terms of unlimited extent. The words 'any person or persons' are broad enough to comprehend every human being. But general words must not only be limited to cases within the jurisdiction of the State, but also to those objects to which the legislature intended to apply them." In the latter case it was held that an act that forbade all persons from assisting the migration into the United States of "any alien or aliens, any foreigner or foreigners," under contract "to perform labor or services of any kind," did not include a minister of religion, though such a person was within the letter of the statute. These cases show that we may with propriety give to the words "any of its employés" the narrower meaning, and, because such meaning saves the act from condemnation, it is, I believe, our imperative duty to adopt it. No words need to be read into the act. It is required only that the words already there shall be applied to that commerce which Congress referred to, namely, territorial, foreign and interstate. Thus read, the whole statute is saved and no part of it is destroyed.

The natural meaning of the words of the statute considered together, each word receiving significance from those with which it is allied, the respect which is due to Congress, the

belief which I hold that it would not intentionally overstep the clearly defined limits of its authority, and the principles of construction heretofore acted upon by this court, lead my mind to the settled conviction that the statute can be interpreted, and ought to be interpreted, as affording the remedy therein prescribed only to the employés of foreign, interstate and territorial carriers, who are themselves engaged in some capacity in such commerce in some of its manifold aspects. If this meaning be attributed to the words of the law, it is apparent that in the opinion of a majority of the court the law, in its main features at least, would be constitutional.

Entertaining these views of the meaning of the statute, I am compelled to go further and consider the other objections to it. I agree entirely with all that was said in the opinion of Mr. Justice White in support of the power of the Congress to enact a law of this general character, but, as I think that the judgments in these cases ought to be reversed, I cannot escape dealing with specific objections to the statute which he has not deemed it necessary to discuss. I think it better, therefore, to deal with all the questions that are necessarily raised in these cases.

I come now to the question whether the statute, thus construed, is in the execution of any power conferred by the Constitution upon the Congress. It is apparent that there is no such power unless it be found in that clause of the Constitution which authorizes Congress "to regulate commerce with foreign nations and among the several States and with the Indian tribes." It hardly needs to be said that the inability of the National Government, created by the Articles of Confederation, to deal effectively with commerce was one of the efficient causes of the call for the constitutional convention. No doubt the most urgent need of that time was a central government with powers adequate to control foreign commerce, but interstate commerce was not overlooked, though its principal importance then consisted in its relation to foreign commerce. [Federalist, No. 42, by Mr. Madison.]

No one could then have foreseen the extent of the interstate commerce of our times, for no one could forefell the employment of the forces of steam and electricity which have so wonderfully aided its development. But the statesmen of that time, confident of the future and hopeful that they might devise a government which would endure, must have understood that the commerce which concerned more than 'one State, from its essential nature, was in part outside the territorial jurisdiction of any State, could not be governed efficiently by a single State, and, if left outside of the National control, would be subject to woeful embarrassment by the conflicting regulations of the several States into which it entered: It appears in the reports of the debates that these dangers were appreciated by the members of the convention, so far as they threatened that part of the commerce among the States which was conducted by water transportation, then the only part of such commerce of sufficient importance to attract public attention. But fortunately the spirit of the nation builder and not of the codemaker inspired and dominated the convention. Its members were not content to frame a system of laws sufficient for the present moment, which might in a few years become unsuited to or inadequate for the needs of the people. They undertook rather the task of devising a scheme of government and of allotting the powers usually exercised by governments between the existing States and the prospective Nation. Whenever such a power came under consideration its nature was examined, and it was then placed in the hands of that governmental agency which it was supposed could exercise it most advantageously. This very power furnishes a signal illustration of the method pursued. The convention did not determine how interstate commerce should be regulated but rather who should regulate it, and left, with certain limitations, the necessity, extent and nature of the regulation to the contemporaneous knowledge, wisdom and discretion of the body in whom the power was vested. We may well believe that, contemplating the subject with the enlarged vision of

those who are building for a future unknown or dimly discerned, and seeing clearly that interstate like foreign commerce was, in the words of the resolutions with which Randolph opened the deliberations of the convention, a matter "to which the separate States are incompetent, or in which the harmony of the United States may be interrupted by the exercise of individual legislation," the convention was constrained to associate the two together in every draft of the Constitution proposed, and place them with the Indian trade, under the control of the National legislature. Madison's Journal, Scott's edition, pp. 67, 161, 164, 185, 362, 453, 654, 656, 704, 753.

The different kinds of commerce described have the common qualities that they are more extensive than the jurisdiction of a single State and liable to injury from conflicting state laws, and thereby are all alike distinguished from the purely internal commerce of the States. There is nothing in the words of the grant that permits the belief that the power is not coextensive over foreign, interstate, and Indian trade, or is anything less than the whole power which any government may properly exercise over either, though it may well be that the restrictive parts of the Constitution, its prohibitions and reservations, may operate differently on different kinds of commerce, or even on different aspects of the same kind of commerce.

It is said that Congress has never before enacted legislation of this nature for the government of interstate commerce on land, though it has for the government of such commerce upon the water and for the government of foreign commerce; that on the contrary the relations affected have been controlled by the undoubted power of the States to govern men and things within their respective dominions; and that this omission of Congress is of controlling significance. The fundamental fallacy of this argument is that it misunderstands the nature of the Constitution, undervalues its usefulness, and forgets that its unchanging provisions are adaptable to the

infinite variety of the changing conditions of our National life.
Surely there is no statute of limitations which bars Congress
from the exercise of any of its granted powers, nor any au-
thority, save that of the people whom it represents, which
may with propriety challenge the wisdom of its choice of the
time when remedies shall first be applied to what it deems
wrong. It cannot be doubted that the exercise of a power for
the first time may be called upon to justify itself. The fact
that it is for the first time is a circumstance to be considered.
But in this case it is a circumstance whose significance dis-
appears in the light of history. Henry Adams, a writer of high
authority, in the first chapter of his History of the United
States, has drawn a vivid picture of the conditions of our
National life at the beginning of the nineteenth century. The
center of population was near Baltimore. The interior was
almost impenetrable except by the waterways and two wagon
roads from Philadelphia to Pittsburg and from the Potomac
to the Monongahela. The scattered settlements of what was
then the Western country were severed from the seaboard
settlements by mountain ranges, and there was little connec-
tion between the two almost independent peoples. There was
scarcely a possibility of trade between the States except along
the seacoast and over the dangerous and uncertain rivers.
"The experience of mankind," says the author, p. 7, "proved
trade to be dependent on water communications, and as yet
Americans did not dream that the experience of mankind was
useless to them." We need not look beyond these conditions
for an explanation why Congress, though it early and vigorously
exercised its power of legislation over foreign commerce and
interstate commerce by water, left it unused in respect to
interstate commerce on the land. As population multiplied,
bringing the isolated settlements nearer to each other, wealth
increased, creating a wider demand for commodities, and roads
and bridges came to be better and more numerous, doubtless
overland commerce was somewhat stimulated. But the iron
restrictions which nature had placed upon land transportation

remained constant until they were unloosed by the operation of the steam railroad.  The system of steam transportation began modestly by the construction of short lines, often wholly within a single State.  These lines were lengthened by extensions and consolidations, until at the present time the States of the Union are all bound together by a network of interstate railroads.  Their operation, aided by the quick and cheap transmission of the mails, and the communication of intelligence by electricity, has transformed the commerce of the country.  Interstate commerce by land, once so slight as to be unworthy of the attention of the National legislature, has come to be the most important part of all trade, and it is not too much to say that the daily needs of the factory and the household are no longer dependent upon the resources of the locality, but are largely supplied by the products of other States.

It was not reasonably to be expected that a phenomenon so contrary to the experience of mankind, so vast, so rapidly developing and changing, as the growth of land commerce among the States, would speedily be appreciated in all its aspects, or would at once call forth the exercise of all the unused power vested in Congress by the commerce clause of the Constitution.  Such a phenomenon demands study and experience.  The habit of our people, accentuated by our system of representative government, is not so much in legislation to anticipate problems as it is to deal with them after experience has shown them to exist.  So Congress has exercised its power sparingly, step by step, and has acted only when experience seemed to it to require action.  A description of its action in this respect was given in *In re Debs*, 158 U. S. 564, where it was said, p. 579: "Congress has exercised the power granted in respect to interstate commerce in a variety of legislative acts.  Passing by for the present all that legislation in respect to commerce by water, and considering only that which bears upon railroad interstate transportation (for this is the specific matter involved in this case), these acts

may be noticed: First. That of June 15, 1866, c. 124, 14 Stat. 66, carried into the Revised Statutes as § 5258, which provides: 'Whereas the Constitution of the United States confers upon Congress, in express terms, the power to regulate commerce among the several States, to establish post roads, and to raise and support armies: Therefore, *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That every railroad company in the United States whose road is operated by steam, its successors and assigns, be, and is hereby, authorized to carry upon and over its road, boats, bridges, and ferries all passengers, troops, government supplies, mails, freight, and property on their way from any State to another State, and to receive compensation therefor, and to connect with roads of other States so as to form continuous lines for the transportation of the same to the place of destination.' Second. That of March 3, 1873, c. 252, 17 Stat. 584 (Rev. Stat. §§ 4386 to 4389), which regulates the transportation of live stock over interstate railroads. Third. That of May 29, 1884, c. 60, § 6, 23 Stat. 31, 32, prohibiting interstate transportation by railroads of live stock affected with any contagious or infectious disease. Fourth. That of February 4, 1887, c. 104, 24 Stat. 379, with its amendments of March 2, 1889, c. 382, 25 Stat. 855, and February 10, 1891, c. 128, 26 Stat. 743, known as the 'Interstate Commerce Act,' by which a commission was created with large powers of regulation and control of interstate commerce by railroads, and the sixteenth section of which act gives to the courts of the United States power to enforce the orders of the commission. Fifth. That of October 1, 1888, c. 1063, 25 Stat. 501, providing for arbitration between railroad interstate companies and their employés; and, Sixth, the act of March 2, 1893, c. 196, 27 Stat. 531, requiring the use of automatic couplers on interstate trains, and empowering the Interstate Commerce Commission to enforce its provisions."

Since this decision other laws more fully regulating interstate commerce on land have been enacted. which need not

here be stated. They show a constantly increasing tendency to exercise more fully and vigorously the power conferred by the commerce clause. It is well to notice, however, that Congress has assumed the duty of promoting the safety of public travel by enacting the Safety Appliance Law; an act to require reports of casualties to employés or passengers (31 Stat. 1446); a resolution directing the Interstate Commerce Commission to investigate and report on the necessity for block signals (34 Stat. 838); an act limiting the hours of service of employés, and the act under consideration. These acts, all relating to interstate transportation, demonstrate the belief of Congress that the safety of interstate travel is a matter of National concern, and its deliberate purpose to increase that safety by laws which it deems conducive to that end. I think, therefore, that we may consider whether this act finds authority in the commerce clause of the Constitution without embarrassment from any inferences which may be drawn from the inaction of Congress.

It is settled beyond the necessity of citing cases that the transportation of persons and property is commerce, in other words, that the business of carriers is commerce. Where, therefore, the business is foreign or interstate, Congress, it has frequently been decided, has the paramount, if not the sole, power to legislate for its direct control. An obstruction of such commerce by unlawful violence may be made punishable under the laws of the United States, suppressed by the armies of the United States, or, at the instance of the United States, enjoined in its courts. *In re Debs, ubi sup.* It is difficult to conceive how legislation may effectively control the business if it cannot regulate the conduct of those engaged in the business, while engaged in the business, in every act which is performed in the conduct of the business. The business of transportation is not an abstraction. It is the labor of men employed with the aid of instrumentalities, animal and mechanical, in carrying men and things from place to place. In every form of transportation, from the simplest to the most

complex, whether the man carries the burden on his back, or drives an animal which carries it, or a locomotive which draws a car which carries it, the one and only constant factor is the labor of mankind. I am quite unable to understand the contention made at the bar that the power of Congress is to regulate commerce among the States and not to regulate persons engaged in commerce among the States, for in the case of transportation at least the labor of those engaged in it is commerce itself. How poor and meagre the power would be if, whenever it was exercised, the legislator must pause to consider whether the action proposed regulated commerce or merely regulated the conduct of persons engaged in commerce. The contention derives some plausibility from its vagueness. Of course the power to regulate commerce does not authorize Congress to control the general conduct of persons engaged therein, but, unless it is an idle and useless power, it authorizes Congress to control the conduct of persons engaged in commerce in respect to everything which directly concerns commerce, for that is commerce itself. It would seem, therefore, that when persons are employed in interstate or foreign commerce, as the employment is an essential part of that commerce, its terms and conditions, and the rights and duties which grow out of it, are under the control of Congress subject only to the limits on the exercise of that control prescribed in the Constitution. This has been the view always expressed or implied by this court. In his concurring opinion in *Gibbons* v. *Ogden,* 9 Wheat. 1, Mr. Justice Johnson said, p. 229: "Commerce, in its simplest signification, means an exchange of goods; but in the advancement of society, labor, transportation, intelligence, care and various mediums of exchange become commodities and enter into commerce; the subject, the vehicle, the agent, and their various operations, become the objects of commercial regulations." In *Cooley* v. *Board of Wardens,* 12 How. 299, the court in holding, *inter alia,* that a regulation of pilots is a regulation of commerce within the meaning of the commerce clause

said (p. 316, by Justice Curtis) of the power: "It extends to the persons who conduct it, as well as to the instruments used." In the opinion of the court, delivered by Mr. Justice Field, in *Sherlock* v. *Alling,* 93 U. S. 99, it was said, p. 103: "It is true that the commercial power conferred by the Constitution is one without limitation. It authorizes legislation with respect to all the subjects of foreign and interstate commerce, the persons engaged in it and the instruments by which it is carried on." In delivering the opinion of the court in *Smith* v. *Alabama,* 124 U. S. 465, where a state statute requiring interstate locomotive engineers to obtain a license after a qualifying examination, and imposing a penalty for operating without such license, was sustained, Mr. Justice Matthews said, p. 479: "It would, indeed, be competent for Congress to legislate upon its subject matter and to prescribe the qualifications of locomotive engineers for employment by carriers engaged in foreign or interstate commerce." In sustaining a similar state statute, directed against color blindness, Mr. Justice Field said in *Nashville &c. Railway* v. *Alabama,* 128 U. S. 96, 99: "It is conceded that the power of Congress to regulate interstate commerce is plenary; that, as incident to it, Congress may legislate as to the qualifications, duties, and liabilities of employés and others on railway trains engaged in that commerce; and that such legislation will supersede any state action on the subject. But until such legislation is had, it is clearly within the competency of the State to provide against accidents on the train." In *Chicago &c. Railway* v. *Solan,* 169 U. S. 133, a state statute forbidding a contract limiting liability for injury was sustained, the court, by Mr. Justice Gray, saying, p. 137: "The rules prescribed for the construction of railroads, and for their management and operation, designed to protect persons and property, otherwise endangered by their use, are strictly within the scope of the local law. They are not, in themselves, regulations of interstate commerce, though they control, in some degree, the conduct and liability of those engaged in such commerce.

So long as Congress has not legislated upon the particular subject, they are rather to be regarded as legislation in aid of such commerce, and as a rightful exercise of the police power of the State to regulate the relative rights and duties of all persons and corporations within its limits." This statement was assumed to be true in *Pennsylvania Railroad* v. *Hughes*, 191 U. S. 477, and *Martin* v. *Pittsburg &c. Railroad*, 203 U. S. 284. The case of *Peirce* v. *Van Dusen*, 78 Fed. Rep. 693, was decided by the Court of Appeals of the Sixth Circuit by Mr. Justice Harlan and Judges Taft and Lurton. The opinion was delivered by Mr. Justice Harlan. After sustaining a state statute, which modified the common law rules with respect to the liability for injuries of a carrier to its employés, he said of it: "The Ohio statute is not applicable alone to railroad corporations of Ohio, engaged in the domestic commerce of this State. It is equally applicable to railroad corporations doing business in Ohio, and engaged in commerce among the States, although the statute, in its operation, may affect in some degree a subject over which Congress can exert full power. The States may do many things affecting commerce with foreign nations and among the several States until Congress covers the subject by National legislation. . . . . Undoubtedly the whole subject of the liability of interstate railroad companies for the negligence of those in their service may be covered by National legislation enacted by Congress under its power to regulate commerce among the States."

We may not trust implicitly to the accuracy of statements gathered from opinions where the precise question was not for decision. But where, as in these quotations, the statements were an essential part of the course of reasoning deemed appropriate for the disposition of the cases, where the same thought clothed in different words has been expressed at intervals from early times to the present day, and where no decision or judicial utterance has been found in opposition to them, they are entitled to profound respect, and furnish cogent evidence of what the law has always been supposed to

be by the members of this court. They cannot be regarded lightly, and if we follow them they lead us to the conclusion that the national power to regulate commerce is broad enough to regulate the employment, duties, obligations, liabilities and conduct of all persons engaged in commerce with respect to all which is comprehended in that commerce. Upon what principle except this could this court have twice enforced the Safety Appliance Act, undisturbed by a doubt of its constitutionality? *Johnson* v. *Railroad,* 196 U. S. 1; *Schlemmer* v. *Railroad,* 205 U. S. 1. That act (27 Stat. 531) compelled interstate railroads to equip all their trains with power brakes operated from the engine, and all their cars with automatic couplers, grab-irons, and hand holds, by enacting that the use of engines and cars not thus equipped should be unlawful. There was no express provision that an employé injured by the failure of a railroad to comply with the law should be entitled to damages, but without doubt the liability of the railroad is implied. The common law rule governing the liability was materially changed by § 8, which abolished in part the doctrine of the assumption of risk, by providing that the employé should "not be deemed to have assumed the risk" of the unlawful conditions, though he knew of them and continued in his employment. This section was enforced in most emphatic manner in the *Schlemmer case,* where Mr. Justice Holmes said, 205 U. S. 11: "An early, if not the earliest, application of the phrase 'assumption of risk' was the establishment of the exception to the liability of a master for the negligence of his servant when the person injured was a fellow-servant of the injured man." If the statute now before us is beyond the constitutional power of Congress, surely the Safety Appliance Act is also void, for there can be no distinction in principle between them. If Congress can create a liability to an injured employé for the existence of conditions in certain mechanisms which he uses, by declaring those conditions unlawful, it may create the same liability for negligence of the agents and imperfections in the instruments used in the car-

rier's work; if it may change the common law rule of the assumption of the risk of imperfect appliances, it may change the rule of the assumption of the risk of a careless fellow servant. I can conceive of no principle of constitutional law which enables us to say that the commerce clause authorizes Congress to fix upon the carrier a liability for an insufficient brake but not for a defective rail, for the absence of automatic couplers, but not for the negligent order which brings trains into collision, for an insecure grab-iron, but not for a heedless switchman. If Congress has the right to control the liability in any way it may control it in every way, subject, as all powers are subject, to the express prohibitions of the Constitution. Unless the cases on the safety appliance acts are deemed to have been inadvertently decided, they seem to be conclusive of this branch of the case. This seems to have been feared by counsel for one of the defendants, who in his brief said "that the giving of a right of recovery to an injured employé is a proper and necessary method for making effective the Safety Appliance Act  .  .  .  we do not admit."

But if we put aside the authority of precedents, and examine the nature and extent of the grant to Congress of power over commerce in the light of the settled principles of interpretation fit to be applied to the exposition of a constitution, we shall arrive at the same result. One main purpose and effect of the Constitution was to devise a scheme of efficient government. In order to accomplish this all the powers usually exercised by governments were distributed between the States and the Nation, except those deemed unfit or unsafe to be entrusted to either and withheld from both. In the allotment of powers to the Nation they were enumerated rather than defined. In the enumeration words of the largest import were employed, comprehending within their meaning grand divisions of the powers of government. The nature of the Constitution, said Chief Justice Marshall (*McCulloch* v. *Maryland*, 4 Wheat. 316, p. 407), "requires that only its great outlines should be marked, its important objects designated, and

the minor ingredients which compose those objects be de-
duced from the nature of the objects themselves." The wide
extent of the powers granted to Congress is expressed in a few
simply worded provisions, all of which might be printed on a
single page of its book of annual laws. Counsel have argued
that the power to regulate commerce does not include the
power to regulate the conduct of persons engaged in that
commerce in respect of that commerce. This is what Mr.
Justice Miller (110 U. S. 658) described as "the old argument
often heard, often repeated, and in this court never assented
to, that when a question of the power of Congress arises the
advocate of the power must be able to place his finger on
words which expressly grant it." Suppose that method of
reasoning had been applied to the power "to establish post
offices and post roads," under which Congress governs the
postal system of the country as fully and freely in every detail
as it is governed by any other nation. It could be said to
Congress, you cannot carry the mail, you cannot issue money
orders, you cannot determine what shall be excluded from the
mail, you cannot regulate the conduct of those who are em-
ployed in the mail service, you cannot exempt them from
militia duty, you cannot punish their theft or embezzlement,
you cannot punish him who breaks and enters the post office
or mail car—all these powers are reserved to the States. You
can only establish post offices and post roads, and when that
is done your power is exhausted. Yet Congress has done all
these things and no one now doubts its power to do them,
because the grant of power is of the whole governmental power
over the subject. So, too, the power to regulate interstate
and foreign commerce is the whole power which any govern-
ment can exercise over that subject, it "is vested in Congress
as absolutely as it would be in a single government having in
its constitution the same restrictions on the exercise of the
power as are found in the Constitution of the United States."
Marshall, C. J., in *Gibbons* v. *Ogden, ubi sup.*, 197; *The Lottery
case,* 188 U. S. 321. We are brought then directly to the

inquiry whether a power so extensive is a sufficient warrant for the enactment of the statute before us.

By what has been called the auxiliary power Congress may "make all laws which shall be necessary and proper for carrying into execution" its granted powers. It is settled that this provision authorizes the enactment of laws which, in the exercise of a wide discretion, Congress deems adapted to secure a legitimate end and calculated to effect any of the objects entrusted to it, and the exercise of that discretion, unless it violates some prohibition of the Constitution or is used as a pretext to accomplish some object not entrusted to the National Government, cannot be reviewed by the judicial branch of the Government without trespassing upon a domain which is peculiarly and exclusively the province of the legislative branch. If the statute under consideration be brought to the test of these principles there can be no doubt of its validity.

It cannot be denied that in that part of commerce which consists in transportation, the safety of those who are concerned in it as passengers or employés is of the first importance. As was said by Mr. Justice Gray, in *Chicago &c. Raïlway Co.* v. *Solan,* 169 U. S. 133, 135, "the fundamental principle on which the law of common carriers was established was the securing of the utmost care and diligence in the performance of their public duties." The Government having the relations which the National Government has to interstate commerce, pronounced by the court in the *Debs Case,* 158 U. S. 564, 578, to be "those of direct supervision, control, and management," which neglects to do what it is fitting for a government to do to insure the safety of public travel, fails in the performance of its highest duty. The lengthening list of casualties to employés and passengers on our railroads has arrested the public attention and created public alarm. Ought Congress alone to be indifferent? Or have we so weak a system of government that the only part of it which is clothed with direct authority over the commerce in which the casualties happen is powerless? What does the "direct supervision, control, and management" amount to if

it does not include the power to pass any laws really calculated to lessen the great dangers of public travel? Congress, recognizing its responsibility and believing in its power, has enacted the group of laws to which reference has been made. Of one (the Safety Appliance Act) the Chief Justice said, in the *Johnson Case*, 196 U. S. 17, what is true of all: "The primary object of the act was to promote the public welfare by securing the safety of employés and travellers." That act, like this, in terms simply safeguarded the employé, but his safety cannot be separated from the safety of the traveller; both may be affected by the same act of negligence and the same defect in appliances, and suffer injury in the same disaster. Any law which promotes the safety of either promotes the safety of both. Much of the law of common carriers, whether created by decisions of the courts or by acts of legislatures, has been upon or influenced by the theory that the nature of the liabilities imposed upon the carriers directly affects the care, diligence and safety with which they conduct their business. For instance, one consideration which has influenced the courts in the judicial development of the fellow-servant doctrine is, that, by imposing upon the employé the risk of the carelessness of the men with whom he works, a greater degree of care and therefore of safety would result. The truth of this theory has been often disputed (see *Chicago &c. Railroad* v. *Ross*, 112 U. S. 377), and it is almost universally disregarded in modern legislation. It is of no importance here whether it is right or wrong. The only significance is that the greater or less liability in damages is generally regarded as having some relation to the safety of operation. It follows that if Congress, in the exercise of its plenary power over interstate and foreign transportation, deems that the safety of that transportation would be increased by enacting that those employed in it shall have a different remedy for injuries sustained by its negligent conduct than that furnished by the laws of the States, this court cannot, without overstepping the boundary which separates the judicial from the legislative field, declare the enactment void.

The power of Congress to enact the law under consideration, which seems so clearly to result from a just interpretation of the commerce clause, might not have been disputed but for the fact that up to this time the subject has been left to be dealt with by the States. If a doubt ever existed that the States could lawfully deal with the subject under the general legislative authority to govern their territory, which was undisturbed by the Constitution, that doubt was dispelled by the decision in *Sherlock* v. *Alling, ubi sup.*, 93 U. S. 99, and it is now agreed that the State may, in the absence of action by Congress, fix and determine the liability of all carriers while operating within the State, to those whom they employ for the injuries which are suffered in the course of the employment. But such authority in the State is not inconsistent with a like authority in the Nation. Where, as in the case of our dual government, the same territories and the same individuals are subject to two governments, each supreme within its sphere, both governments by virtue of distinct powers may legislate for the same ends. The exercise of the rightful authority of the Nation and the State, though it proceeds from different governmental powers, may reach and control the same subject. This result arises from the different relations to the community the subject may sustain; a drove of cattle may be at once interstate freight and the vehicle by which infectious disease may be brought within the borders of a State; a bridge may at the same time interrupt the navigation of the river and serve as a continuation of the highways of the State; a man, while the agent through which the transaction of interstate commerce is conducted, is at the same time one of the population, permanent or transient, of a State and subject to its general laws. There is no conflict in powers, though there may be conflict in legislation, referable to different powers. In such a case under our system the law of the State enacted by virtue of its undoubted powers must yield to the national law enacted in pursuance of the powers conferred by the Constitution. There is no necessity in this case to disturb the troublesome question

when, if ever, even where Congress is silent, the States may exercise any direct power over interstate and foreign commerce. For the power hitherto exercised by the States over this particular subject has never been deemed to be a regulation of commerce, but rather an exercise of their authority to regulate generally the relations of men to each other, which may indirectly affect such commerce. "If a State," said Chief Justice Marshall (in *Gibbons* v. *Ogden, ubi sup.,* 204), "in passing laws on subjects acknowledged to be within its control, and, with a view to those subjects, shall adopt a measure of the same character with one which Congress may adopt, it does not derive its authority from the particular power which has been granted, but from some other, which remains with the State and may be executed by the same means.   All experience shows that the same measure or measures, scarcely distinguishable from each other, may flow from distinct powers; but this does not prove that the powers themselves are identical."   That the States may by their laws fix the relative rights, duties, obligations and liabilities of all persons or corporations within their territorial jurisdictions, and thus control in that respect those who are engaged in interstate and foreign commerce; that such laws do not proceed from any power to regulate such commerce, though incidentally and indirectly they do regulate it, but are to be referred to their general power over persons and things within their territories, and that all such laws, so far as they affect such commerce, must yield to the superior authority of the laws of Congress, is, I think, conclusively shown by the following cases: *Sherlock* v. *Alling,* 93 U. S. 99; *Smith* v. *Alabama,* 124 U. S. 465; *Nashville &c. Railway Co.* v. *Alabama,* 128 U. S. 96; *Hennington* v. *Georgia,* 163 U. S. 299; *New York &c. Railroad* v. *New York,* 165 U. S. 628; *Chicago &c. Railroad Co.* v. *Solan,* 169 U. S. 133; *Pennsylvania Railroad* v. *Hughes,* 191 U. S. 477; *Martin* v. *Pittsburg &c. Railroad,* 203 U. S. 284; *Peirce* v. *Van Dusen,* 78 Fed. Rep. 693.   Upon principle and authority it, in my opinion, is clear that Congress had constitutional power over the subject with which it dealt in the statute before us.

There remains to be considered the objection that the specific provisions of the act exceed the legislative power over the subject. The powers of Congress are not only confined to those which may be inferred from the Constitution, but are also restrained by the express limits upon their exercise which are contained in that instrument. They are delegated and enumerated and then limited. Even when Congress enters upon a field in which it rightfully exercises the supreme governmental power, it is not supreme in the fullest sense. It does not enjoy complete sovereignty like that, for instance, of the British Parliament. All its legislation must obey the express commands of those parts of the Constitution which mark a limit beyond which legislation cannot go. The only limit upon the authority of Congress relevant to the discussion of this branch of the case is that which forbids Congress from depriving any person of his life, liberty or property, without due process of law. Amendment VI. It is contended that, although the law deals with a subject under the control of Congress, it deals with it in such a manner as to violate that prohibition, and is therefore void. Before considering the contention it is desirable to state clearly the substantial provisions of the act. The remedy afforded by it is more generous to the employé than that given by the common law in several respects. The common law recognized no recovery of damages for death resulting from negligence; by the statute damages are recoverable for death as well as for injury. The common law allowed no recovery against the employer for the neglect of a fellow-servant engaged in a common employment; by the statute the employer is held responsible for the negligence of any of its officers, agents or employés, even though the guilty person is a fellow-servant of him who is injured or killed. The common law denied to one who by his negligence had contributed to his own injury the right to a remedy for the neglect of another which had been a concurring cause; by the statute the negligent sufferer may recover if his negligence be slight, and that of the employer gross in comparison, though the contributing

negligence must be taken into account in reduction of the damages. The common law, as adjudged by this court, permitted the employé to enter into a contract renouncing his right to damages in case he incurred injuries in the course of his employment; the statute forbids such a contract. Thus four doctrines of the common law restrictive of the employés' rights are supplanted by others more favorable to him.

There can be no doubt of the right of a legislative body, having jurisdiction over the subject, to modify the first three of these rules of the common law in the manner in which this act of Congress does it. They are simply rules of law, unprotected by the Constitution from change, and like all other such rules must yield to the superior authority of a statute. They have so generally been modified by statute that it may well be doubted if they exist in their integrity in any jurisdiction. The common law rules have taken form through the decisions of courts, whose judges in announcing them were controlled by their views of what justice and sound public policy demanded. This is nowhere more clearly stated than by Chief Justice Shaw in *Farwell* v. *Boston & Worcester Railroad*, 4 Met. 49, the leading American case establishing the doctrine that one cannot recover against the master for the negligence of a fellow-servant, where he said: "In considering the rights and obligations arising out of particular relations, it is competent for courts of justice to regard considerations of policy and general convenience, and to draw from them such rules as will, in their practical application, best promote the safety and security of all parties concerned." But the economic opinions of judges and their views of the requirements of justice and public policy, even when crystallized into well-settled doctrines of law, have no constitutional sanctity. They are binding upon succeeding judges, but while they may influence they cannot control legislators. Legislators have their own economic theories, their own views of justice and public policy, and their views when embodied in a written law must prevail. Whenever the legislative power to change any of these rules of the

common law has been drawn in question in this court it has been sustained. Various state statutes allowing a remedy against a railroad employer for the negligence of a fellow-servant have been held to be within the legislative power. *Missouri Pacific Railway Company* v. *Mackey*, 127 U. S. 205; *Minneapolis &c. Railway Company* v. *Herrick*, 127 U. S. 210; *Chicago, Kansas & Western Railroad Company* v. *Pontius*, 157 U. S. 209; *Tullis* v. *Lake Erie & Western Railroad*, 175 U. S. 348. State statutes, allowing a recovery for death, were sustained in *Steamboat Company* v. *Chase*, 16 Wall. 522, and *Sherlock* v. *Alling*, 93 U. S. 99, though the statute was attacked in the first case only on the ground that it intruded upon the admiralty jurisdiction exclusively vested in the courts of the United States, and in the second case because it interfered with interstate commerce, whose regulation was vested exclusively in Congress. Statutes of this kind have been in force in the States and doubtless in the Territories for many years, many cases have been tried under them, and in no case has it ever been claimed that anything in the Constitution removes them from the legislative power. The same observation may be made, though not so emphatically of statutes modifying the common law rule denying a recovery to one contributing to the injury by his own neglect. It is interesting to note that this court, acting upon the same reasons which doubtless influenced Congress in the enactment of this part of the statute, established a rule in principle the same, to govern the recovery in admiralty of damages by a person injured on a ship (*The Max Morris*, 137 U. S. 1, 14), holding that it promoted "the more equal distribution of justice, the dictates of humanity, the safety of life and limb and the public good." It is enough to say here that the decisions of the court in the safety appliance cases, supporting a statute changing the analogous common law doctrine of assumption of risk, are in principle conclusive that the whole subject of contributory negligence is under the control of the legislative power, in this respect unrestrained by any constitutional provision. But it is earnestly urged upon us

that the statute under consideration, applying to all interstate common carriers and all their employés in that business, without distinguishing between that part of the business and employment which is dangerous and hazardous and that part which is not, and confined solely to the business of common carriage and its employers, is a deprivation of the employer's property without due process of law, in violation of the Fifth Amendment of the Constitution. The manner in which due process of law is said to be denied is by the denial of the equal protection of the laws by imposing unusual burdens upon a class of persons arbitrarily and capriciously selected. In support of this position cases from state courts interpreting state constitutions and cases from this court interpreting the restriction upon state action imposed by the Fourteenth Amendment, are indiscriminately cited. They furnish little aid.

It is not necessary in this case to determine how far, if at all, the requirement from the States of the equal protection of the laws made by the Fourteenth Amendment is included in the requirement from the Nation of due process of law made by the Fifth Amendment to the Constitution. It is enough to say that this statute complies with both. It is rather startling to hear that in enacting laws applicable to common carriers alone Congress has made a capricious and arbitrary classification. From time immemorial the common law has set apart those engaged in that business as a peculiar class, to be governed in many respects by laws peculiar to themselves. In separating carriers from those engaged in other interstate and foreign commerce, Congress has but followed the ancient classification of the common law, based upon reasons so obvious that they need no statement. Whether the law should be made to apply to all carriers or to carriers by railroad alone, or whether the employés should be classified according to the degree of danger which surrounds their employment, is a matter of legislative discretion with which we have no right to meddle. See *Union Pacific Railway Co.* v. *Mackey, ubi sup.*

I have confined my observations up to this point to the first

three changes in the common law made by the statute. The fourth change, that forbidding the employé to make a contract releasing his employer from the consequences of his negligence, is open to a possible objection not common to the others. It is asserted that this part of the act violates the right of free contract which in some cases this court has protected against the exercise of the legislative power. Without intimating any opinion on that subject, it is enough to say that that part of the statute is separable from and independent of the remainder, and may stand or fall by itself, and that no question concerning it is raised in these cases. I see nothing in the provision that "all questions of negligence or contributory negligence shall be for the jury" which affects the right of jury trial guaranteed by the Seventh Amendment. Such questions always have been for the jury, and I cannot see that this enactment makes any change whatever.

I am of opinion, therefore, that the act should be sustained as a legitimate exercise of the authority of Congress, and that orders in these cases should be made accordingly.

MR. JUSTICE HARLAN (with whom concurred MR. JUSTICE McKENNA), dissenting.

Mr. Justice McKenna and myself are of opinion that it was within the power of Congress to prescribe, as between an interstate commerce carrier and its employés, the rule of liability established by the act of June 11, 1906. But we do not concur in the interpretation of that act as given in the opinion delivered by Mr. Justice White, but think that the act, reasonably and properly interpreted, applies, and should be interpreted as intended by Congress to apply, only to cases of interstate commerce and to employés who, at the time of the particular wrong or injury complained of, are engaged in such commerce, and not to domestic commerce or commerce completely internal to the State in which the wrong or injury occurred. We concur in the views expressed by Mr. Justice Moody as to the

scope and interpretation of the act. We think the act is constitutional, and, therefore, that the judgment should be reversed.

MR. JUSTICE HOLMES, dissenting.

I must admit that I think there are strong reasons in favor of the interpretation of the statute adopted by a majority of the court. But, as it is possible to read the words in such a way as to save the constitutionality of the act, I think they should be taken in that narrower sense. The phrase "every common carrier engaged in trade or commerce" may be construed to mean "while engaged in trade or commerce" without violence to the habits of English speech, and to govern all that follows. The statute then will regulate all common carriers while so engaged in the District of Columbia or in any Territory, thus covering the whole ground as to them; and it will regulate carriers elsewhere while engaged in commerce between the States, etc., thus limiting its scope where it is necessary to limit it. So construed I think the act valid in its main features under the Constitution of the United States. In view of the circumstances I do not discuss details.